No. 80,742

STATE OF KANSAS, *Appellee*, v. RAMON ANTHONY JUILIANO, *Appellant*.

(991 P.2d 408)

Opinion filed November 5, 1999.

*Geary N. Gorup*, of Render Kamas, L.C., of Wichita, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Ramon Anthony Juiliano, from his convictions for criminal solicitation to commit first-degree murder (K.S.A. 21-3303; K.S.A. 21-3401) and first-degree murder (K.S.A. 21-3401).

The defendant challenges a read-back of the firearms examiner's testimony, the sufficiency of the evidence to sustain the convictions, and whether the trial court erred in refusing to dismiss the charge of solicitation to commit first-degree murder at the close of the State's case in chief.

The essential facts are as follows. Michelle Jardon, at all times pertinent to this case, was married to and living with her husband. She began having an extra-marital affair with the defendant in 1993. The victim, Jack West, met Jardon in 1997 and also began an affair with her.

The defendant, who wanted Jardon to divorce her husband and marry him, became severely depressed and saw a therapist to control his anger after Jardon attempted to end their affair. The defendant told several others that he would like to kill West but that he lacked the nerve to do so.

In April 1997, the defendant asked a friend to send Charles Chaney to the defendant's home to replace the defendant's bathroom floor. The defendant's and Chaney's testimony conflicted at trial. Chaney testified that the defendant told him the bathroom floor did not need repaired. The defendant inquired if Chaney would kill his girlfriend's other boyfriend, and if Chaney would not do so, did he know of anyone who would. Chaney testified that the defendant was serious.

The defendant testified that he asked Chaney "what [would] it take to get rid of somebody in this town." The defendant further testified that when he was asked by Chaney if he had meant what

Chaney thought he had meant, the defendant replied, "Yeah, probably." The defendant testified that he never intended for Chaney to kill anyone and that he knew Chaney would not kill anyone. The defendant testified that he merely wanted Chaney to beat up West, leave him in the street, and tell West that the defendant was responsible for the beating.

On May 22, 1997, West came home from work at about 11:15 p.m. and was confronted by a man with a gun who was wearing a ski mask over his face and dressed in a camouflage outfit. The man came out of the woods near West's home. West drove his car to get away. As he looked back, he saw the masked man kneel down in a firing position and point the handgun at his vehicle. West eventually went home. He did not see the masked man again, but reported the incident to the police. The night of May 22, 1997, Jardon was at her parents' house with her husband, celebrating her brother's birthday.

In early June 1997, a Ford Aerostar van was brought to the defendant's property by a co-worker. The defendant was told that its owner could not get his money out of the vehicle and that he wished to perpetrate a fraud on his insurance company by reporting the vehicle stolen. The defendant hid the van in his barn until he could remove the valuable "Eddie Bauer" seats and set it on fire pursuant to the instructions given to him by his co-worker. On June 6, 1997, the owner of the Ford Aerostar van reported it stolen, stating that he had left the keys in the ignition at a shopping mall.

On June 11, 1997, Jardon was celebrating her parents' wedding anniversary with her brother, her parents, and her grandmother. Jardon's husband worked late that night. Jardon spoke with the defendant at approximately 10:30 p.m. The defendant told her that he was tired and that he was planning to go to bed. Jardon called West on his cellular phone at approximately 11:15 p.m., after his work shift ended, as was their usual custom. Jardon spoke with West as he drove from the parking garage until he turned off the engine and pulled the keys from the ignition.

Around 11:30 p.m. that same evening, Linda West and Dan Pratt (West's mother and stepfather) were sitting on their couch waiting for West to get home from work. Pratt could hear West's voice

from outside the front door. Seconds later, Pratt heard West's body hit the front door which was locked and bolted. Pratt jumped up as West tried to open the door and heard two shots, followed shortly thereafter by two more shots. Pratt could not immediately open the door due to the weight of West's body pressing against the outside of the door. Once Pratt was able to open the door, West fell into the doorway fatally wounded by the gunshots and cut by the broken glass of the storm door. Pratt did not see anyone outside or any vehicles nearby. Pratt called 911 at 11:37 p.m.

Investigators did not find any shell casings near the murder scene, which led them to believe that the weapon used to commit the murder was a revolver, which would have retained the casings in the weapon after it was fired.

West's vehicle was searched by the police investigators who determined that West was not robbed, as there was $108 in his wallet and a cell phone in the car, as well as West's keys and checkbook.

At approximately 12:05 a.m. on June 12, 1997, the defendant called 911 and reported a fire on his property. The defendant's home is a 17-minute drive from West's home.

Upon arriving at the defendant's home, an officer observed a barn engulfed in flames with the Ford Aerostar van inside. The officer noticed that the defendant was very nervous and sweating profusely even though it was a very cool night.

The defendant was arrested between 5 and 6 a.m. that morning. Officers noted that the defendant was trembling and uncontrollably nervous.

The defendant consented to a search of his property where numerous firearms and a large amount of ammunition were found. Three spent .357 shell casings were found among the ammunition. Inside the locked barn on the defendant's property, the officers found a set of binoculars, a police scanner pre-set to the Kansas City Kansas Police Department radio frequency, gasoline cans, a pair of working gloves, and the defendant's wallet with identification. Officers also found the Ford Aerostar specialty "Eddie Bauer" seats and bench seat in the defendant's barn.

An autopsy was performed on West and eight bullet fragments from four bullets were removed from his body.

A gun-sniffing dog found a 1997 Smith & Wesson, Model 66, .357 Magnum revolver in a shoulder holster, inside a plastic bag, approximately 176 feet from the defendant's barn in which the police had found the stolen property from the Ford Aerostar van. Inside the revolver were two live and four spent Midway brand rounds. No fingerprints were recovered from the weapon.

A firearms examiner determined that the bullet fragments taken from West's body were fired from the .357 Magnum found near the defendant's property. The examiner also determined that the three spent shell casings found inside the defendant's home had been fired from the same .357 Magnum found near the defendant's property.

A co-worker of the defendant testified that he had sold a .357 Magnum and holster to the defendant and that the gun sold to the defendant was the same one that the police found near the defendant's home. The co-worker further testified that the holster the police had found near the defendant's home looked like the one that he had sold to the defendant.

Another co-worker testified that he had seen the defendant with a .357 Magnum about 2 months prior to the murder and that the gun looked similar to the murder weapon found by the police except that it had mahogany wood grips instead of plastic Pachmayr grips.

The defendant admitted buying a .357 Magnum from a co-worker but denied that it was the same gun found by police near his home. The defendant also denied purchasing a shoulder holster from the co-worker. The defendant claimed that he sold the .357 Magnum for cash in order to pay his child support obligation and that he no longer owned a .357 Magnum.

Prior to trial, the defendant entered pleas of guilty to charges of receiving a Ford Aerostar van, knowing it was stolen, and to subsequently committing arson upon the van at his home after it had been stripped of the valuable equipment. This appeal concerns only the convictions and sentences upon the charges of solicitation to commit the murder of West and the subsequent first-degree murder of West at his home.

## I. READ-BACK

On the second day of jury deliberations, the jury requested a read-back of the firearms examiner's testimony concerning his findings on the three spent .357 shell casings found in the defendant's home. The defendant requested that the read-back include the cross-examination, as well as the direct examination, on the same subject. The trial court allowed only the direct testimony to be read back to the jury, concluding that the cross-examination did not have anything to do with the examiner's testimony regarding the spent .357 shell casings and that the jury's specific question would not be answered by any testimony contained within the cross-examination.

The means by which the trial court complies with a jury's request to have testimony read back is subject to its discretion. *State v. Redford*, 242 Kan. 658, 668, 750 P.2d 1013 (1988). The trial court has the discretion to control the content of the read-back. *State v. Myers*, 255 Kan. 3, 8, 872 P.2d 236 (1994).

In *Myers*, we said:

"K.S.A. 22-3420(3) states that the testimony 'shall be read.' A trial court is required to accede to a jury's request to read back testimony. We do not believe, however, that such a strict construction forecloses all trial court discretion as to the manner of acceding to the request. Both *[State v.]Ruebke* [240 Kan. 493, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987),] and *Redford* are consistent in the view that the trial court has the discretion to control the read-back. The trial court is free to clarify the jury's read-back request where the read-back request is unclear or too broad, or the read-back would jeopardize the manageability of the trial. Discretion rests with the trial court to clarify and focus the jury's inquiry." 255 Kan. at 8.

On direct examination, the firearms examiner testified that the three spent shell casings found in the defendant's home were fired from the .357 Magnum found near the defendant's home and that the .357 Magnum was the weapon used to murder West. The cross-examination of the firearms examiner concerned the examiner's ability to determine when the spent shell casings were fired and who fired the gun at that time. The examiner testified that he could not tell when the three spent shell casings were fired or who had fired the weapon.

In *State v. Gilley*, 5 Kan. App. 2d 321, 615 P.2d 827, *rev. denied* 228 Kan. 807 (1980), the Court of Appeals held that a read-back of particular testimony of a witness requested by a jury in a civil or criminal case does not require that there must be a read-back of all other testimony of that witness. 5 Kan. App. 2d at 323. Where the trial judge provides the jury with the specific portions of testimony that it has requested, the judge has fulfilled the requirements of K.S.A. 22-3420(3). 5 Kan. App. 2d at 323. A jury is free to look at a very focused portion of the testimony it requests and does not have to look at any additional testimony if it does not desire to do so. It is not an abuse of discretion to exclude the cross-examination testimony if the jury did not specifically request it and its contents would not answer the question posed by the jury.

In this case, the jury specifically requested a read-back of the "testimony on the ballistics expert's finding on the three spent .357 Magnum shells found in the plastic bag" in the defendant's home. The jury did not request any additional testimony. The focus of the firearms examiner's testimony concerning his ballistic findings occurred only in the direct testimony. The cross-examination merely concerned the firearms examiner's ability to determine the identity of the person who fired the three bullets and the time they were fired. The judge took a narrow and focused question and provided the jury with exactly what they had asked for. There was no need to include cross-examination of the firearms examiner in the requested read-back. There was no abuse of discretion.

## II. MOTION FOR ACQUITTAL

The defendant argues that the trial court erred in denying his motion for acquittal on the charge of solicitation to commit first-degree murder. A motion for a judgment of acquittal goes to the sufficiency of the evidence to support a conviction. *State v. Ames*, 222 Kan. 88, 95, 563 P.2d 1034 (1977). In a criminal case, the issue on appeal is whether the evidence, when viewed in the light most favorable to the prosecution, convince the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Graham*, 247 Kan. 388, 398, 799 P.2d 1003 (1990).

K.S.A. 21-3303(a) provides:

"Criminal solicitation is commanding, encouraging or requesting another person to commit a felony, attempt to commit a felony or aid and abet in the commission or attempted commission of a felony for the purpose of promoting or facilitating the felony."

There is ample evidence in the record from which a reasonable mind could conclude that the defendant is guilty beyond a reasonable doubt of criminal solicitation to commit murder. Chaney testified that the defendant had asked him to do "some work on his house" under false pretenses. Upon arriving at the defendant's home, the defendant immediately began talking about killing somebody. The defendant told Chaney that "I just want to know if you know anybody or you'll kill somebody for me." Chaney further testified that "[the defendant] just told me that he wanted to know if I'd kill somebody for him and it was his girlfriend's boyfriend." Chaney testified that the conversation lasted 10 to 15 minutes and that the defendant continually asked him to kill somebody. Chaney believed that the defendant was serious when he had asked him to kill the boyfriend.

The evidence on record, when viewed in a light most favorable to the prosecution, is sufficient such that a rational factfinder could have found the defendant guilty beyond a reasonable doubt of solicitation to commit murder at the close of the prosecution's case in chief. The trial court did not err in denying the defendant's motion for acquittal.

## III. SUFFICIENCY OF EVIDENCE

The defendant contends that there was insufficient evidence to convict him. As discussed in the prior issue, when the sufficiency of the evidence is challenged in a criminal case, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Graham*, 247 Kan. at 398. A guilty verdict in a criminal case will not be disturbed on appeal if there is substantial evidence, even though the evidence is entirely circumstantial. *State v. Dunn*, 249 Kan. 488, 491, 820

P.2d 412 (1991). The probative values of direct and circumstantial evidence are intrinsically similar, and there is no logically sound reason for drawing a distinction as to the weight to be assigned to each. *State v. Wilkins*, 215 Kan. 145, 156, 523 P.2d 728 (1974). When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988).

In order to convict the defendant of first-degree murder, the State had to prove that the defendant killed West intentionally and with premeditation. K.S.A. 21-3401(a).

Even though there were no witnesses who saw the defendant kill West, there was sufficient circumstantial evidence that the defendant committed the murder. The murder weapon, a .357 Magnum, was connected back to the defendant. Ballistic testing proved that the gun found near the defendant's home was the same gun used to murder West. Further testing revealed that the three spent shell casings found inside the defendant's home had been fired from the murder weapon.

The defendant asked someone to kill his girlfriend's boyfriend in April 1997. The conversation lasted 10 to 15 minutes. Testimony revealed that the defendant was serious and was not joking about having West killed. The defendant had told several others that he would like to kill West himself, if he had the nerve to do it.

Criminal instrumentalities were found inside the defendant's barn, including binoculars, a police scanner, and gloves. A rational factfinder could conclude that these could be used to stalk West, to keep an ear out for police, and to keep fingerprints off the gun.

The two nights that West was assaulted were, coincidentally, nights that the defendant knew Jardon would be busy with family affairs. Knowing that Jardon would not be present would prevent her from identifying the defendant if he was seen or from being hurt herself.

The defendant had a motive to kill West. Jardon's husband did not. Jardon's husband did not know about her illicit affair with West until after the murder of West. Jardon's husband had alibis for both the night of the murder and the night of the masked assault. Rob-

bery was not a motive for the killing of West, as money, a cell phone, and other valuable personal property were left behind.

The defendant had a diary in which he had expressed a hatred for West. The defendant had expressed to others that he was jealous of West.

When the evidence is viewed in a light most favorable to the State, as we are required to view it, a rational factfinder could have found the defendant guilty beyond a reasonable doubt of the crime of first-degree murder.

We held above that there was sufficient competent evidence to support the jury's verdict on the charge of solicitation to commit first-degree murder. The evidence on the record reveals that the defendant asked Chaney to kill someone for him. The testimony by Chaney indicates that the defendant was serious and that his remarks were not flippant or said in a joking manner. The defendant asked Chaney "what [would] it take to get rid of someone in this town," and did so repeatedly over the course of a 10 to 15 minute conversation.

A rational factfinder could have believed the testimony of Chaney and not believed the testimony of the defendant and could have found the defendant guilty beyond a reasonable doubt of criminal solicitation to commit murder.

Affirmed.