No. 95,945

STATE OF KANSAS, *Appellee*, v. TIMOTHY C. BRYANT, *Appellant*.

(179 P.3d 1122)

Opinion filed March 28, 2008.

*B. Joyce Yeager*, of Yeager Law Firm, LLC, of Overland Park, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Paul J. Morrison*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

Nuss, J.: Timothy C. Bryant directly appeals his jury convictions of felony murder and aggravated robbery. Our jurisdiction is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime. The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the prosecutor engage in misconduct during closing argument? No.
2. Did the district court err in admitting evidence of Bryant's purported prior crimes? No.
3. Did the district court err in admitting autopsy photographs? No.
4. Did the district court err in instructing the jury? No.

5. Did the district court err in its read-back of testimony to the jury? No.
6. Did the district court err in denying Bryant's motion to change counsel? No.

Accordingly, we affirm the district court and convictions.

## FACTS

On January 14, 2005, a Hispanic male, Gustavo Ramirez-Mendez (Gus), was severely beaten and robbed of $23 in Kansas City. Six days later Gus died of blunt force trauma to the head. The defendant, Timothy Bryant, and Walter L. Anderson, both black males, were arrested and charged with aggravated robbery. Within a week the complaint was amended to add one count of felony murder.

Evidence at trial revealed the following events surrounding Gus' robbery and murder. In the evening of January 14, 2005, several friends and family members gathered at the apartment of Bryant's mother, Rosie, in Kansas City, Kansas. Bryant, Anderson, and Gus were three of the individuals present. Gus worked as the maintenance man for Rosie's apartment complex.

Rosie's grandson, Kevin, gave Gus a ride to cash his check that evening. With some of the proceeds Gus then bought alcohol for Rosie and some of the other guests.

Shortly after 10 p.m., Rosie told everyone to leave because she was tired. She was additionally sick of Anderson pestering Gus for money; Anderson was also encouraging Gus to go to a bar with him. Rosie told Anderson to leave Gus alone and go home.

A short time after the party ended, Miguel Rodriguez and his mother-in-law, Otilia Dominguez, called police and reported that they had seen a disturbance in the complex near Rosie's apartment. Responding police found Gus bleeding and in and out of consciousness. His shoes and socks had been pulled off, his pockets had been pulled out, and the contents of his wallet were strewn over the area.

Bryant testified that on the night of the robbery, Kevin had taken Gus to cash his check around 8 p.m. Gus had told people at the party about his check because he was upset that more than half of

its amount had been garnished. Sometime that evening Anderson asked Bryant whether Gus had any money.

According to Bryant, he heard his mother tell Anderson to leave her apartment because Anderson was pestering Gus and Rosie for money. Bryant then left Rosie's apartment and headed home. He stopped at a party along the way, and Anderson followed him there.

Bryant testified that he did not want Gus to go to a bar or for Anderson to take Gus' money so he decided to walk Gus home. He, Anderson, and Gus all walked to Gus' apartment. When Bryant left Gus' apartment, Anderson told him to "just go ahead and leave and let me do what I got to do." Bryant understood that Anderson was going to take Gus' money, so Bryant left.

Bryant further testified that as he was walking home, he heard Anderson call his name. He headed back toward Gus' apartment and saw Anderson removing Gus' socks. Bryant also saw Otilia nearby watching Anderson. Bryant then ran because he knew that Otilia would call the police.

According to Bryant, he ran and hid because he had just been released from prison a few days before. He believed he would be arrested when the police asked him for identification because warrants were still outstanding against him. Bryant repeatedly referred to his recent incarceration.

Bryant testified that after he ran, Anderson told him that he had stolen $23 from Gus. Anderson told him that if he bought drugs with the money, Anderson knew someone who would let them spend the night at her house. After Anderson bought some crack, Bryant "[took] a hit of the crack."

Otilia testified that she had been visiting from out of town that night. She heard knocking on the door around midnight. Otilia did not open the door but looked out the peephole and saw an arm break out the porch light. She notified Miguel, and they called the police.

Otilia first told police, however, that two black men had attacked Gus. At the preliminary hearing, she became more vague, and by trial, she claimed that she could not see much out of the peephole and had just originally *thought* there were two black men. Otilia also changed her story about the color of the sleeve on the arm

breaking the light. Eventually, at trial Otilia could not tell how many individuals were involved, the color of their skin, what color clothes they were wearing, or whether they were male or female.

Officer Amy Sillings testified that on the night of the incident, Otilia told her that a Hispanic man had been followed up the stairs by two black men, and one of the black men broke out the porch light. According to Sillings, Gus told officers on the scene, through Miguel's interpreting, that two men attacked him and took his money.

Officer Mark Bundy also testified that Otilia told him that she had looked through the peephole because someone was banging on the door. She then saw Gus. Otilia said she saw a black man push Gus out of the doorway and break the light. She said she also saw another black man at the bottom of the staircase. According to Bundy, Gus told the officers, again through Miguel, that Gus was walking through the complex when two black men hit him in the face and head and took his money.

Officer Kelly Herron testified that Otilia told him that she heard a knock at the door, so she looked out the peephole. She saw two black men and a Hispanic man outside the door. Then one of the black men punched out the light.

Officer Richard Glenn Nepote testified that Miguel told him that Gus said he was beaten by two black men; Gus thought it was because he had been paid that day.

Miguel basically testified that Gus did not speak but held up two fingers to him, which he interpreted to mean there were two assailants. However, at the preliminary hearing Miguel testified that Gus told him that two people had attacked Gus, and Gus asked Miguel to "help me, help me."

The jury was given 14 instructions, including instructions on aggravated robbery, felony murder, and aiding and abetting. During deliberations, it sent multiple requests to the judge. The jury requested police reports which the judge could not provide because they had not been admitted into evidence. It also requested the testimony of certain law enforcement officers and to review the 911 tape, Bryant's statement to police, and a diagram of the scene. The judge could not provide the diagram or Bryant's statement as

neither had been entered into evidence. Finally, the jury wanted a read-back of Otilia's testimony about the broken light.

After Bryant was convicted of aggravated robbery and felony murder, he was sentenced to a hard 20 sentence plus 233 months for the aggravated robbery.

## ANALYSIS

Issue 1: *The prosecutor did not engage in misconduct.*

Bryant argues that the prosecutor engaged in misconduct during closing arguments. First, he claims that the prosecutor's argument that "there was evidence that [Bryant] had gone through the pockets of the victim" was unsupported by the record. Second, Bryant alleges that the prosecutor "called the veracity of the witnesses into question." He argues that because the jurors were not present at the preliminary hearing, they could not have known that some witnesses made inconsistent statements there and at trial. Third, Bryant claims that "[t]he prosecutor encouraged the jury to disregard the evidence which supported the defense and to improperly draw inferences from the evidence."

The State responds that Bryant misstates the record; the prosecutor "truthfully argued that the two defendants 'were together during the pillaging through Gus' pockets.'" It also argues that Bryant fails to specify which prosecutorial statements purportedly called the veracity of the witnesses into question and which ones allegedly encouraged the jury to improperly draw inferences from the evidence.

This court's decision in *State v. White*, 284 Kan. 333, 337-38, 161 P.3d 208 (2007), reiterated the governing two-step analysis for allegations of prosecutorial misconduct:

"First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal. *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005) (quoting *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]). We have applied the test to prosecutorial action in contexts beyond mere comment on the evidence. See *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006) (citing cases).

"In the second step of the two-step analysis, the appellate court considers three factors to determine whether a new trial should be granted:
'(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 [inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, (1967) [conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial], have been met.' *Tosh*, 278 Kan. 83, Syl. ¶ 2, 91 P.3d 1204."

For his first assertion, Bryant alleges that the following prosecutorial statement is outside the wide latitude given to prosecutors in closing arguments:

"Somebody's holding him down keeping him down so that his pockets and his clothes can be taken off and gone through, pillaged through. Two perpetrators could have easily done that. It might have been a little bit difficult for one, but certainly two could have done it with no problem at all."

Instead of venturing outside her wide latitude, we hold that the prosecutor was simply arguing that this crime was likely committed by two individuals instead of one, a suggestion supported by considerable trial evidence. Officers Sillings, Bundy, Herron, and Nepote all testified that witnesses on the scene saw two perpetrators. Bryant himself testified he was present at least part of the time that Anderson was beating Gus and looking for money.

As for Bryant's second allegation, we agree with the State that he fails to specify which prosecutorial statements purportedly called the veracity of the witnesses into question. We will not independently search the record and guess which specific facts Bryant believes support his general allegations. More than 100 years ago in *Powers v. Kindt,* 13 Kan. 74 (1874), this court observed that the appellant claimed "that the conclusions of fact are not sustained by the evidence, without specifying which particular finding he objects to, or wherein the testimony fails to support it." 13 Kan. at 76. This court refused to further address the matter, holding "[w]ith the increasing pressure of business in this court we have not time to notice any but such objections as are specifically and

clearly pointed out." 13 Kan. at 74; see *Enlow v. Sears, Roebuck & Co.,* 249 Kan. 732, 744, 822 P.2d 617 (1991) (court did not address appellant's argument because appellant failed to specify the error in the jury instructions).

Faced with the same uncertainty, the State nevertheless guesses that Bryant is referring to an allegation made in another portion of his brief, in which he claims that "the prosecutor accused witnesses, including [Otilia] Dominguez and [Miguel] Rodriguez, of tainting the evidence and slanting their testimony." In closing, the prosecutor actually argued:

"Over the course of the last couple of days, you've got to hear from witnesses *who may have been influenced by their sense of loyalty* to their son or their brother. We know that Rosie [defendant's mother] and Angelia [defendant's sister] don't want to see their loved one in trouble or held responsible for this crime and so *perhaps their testimony was tainted a little bit* because of that. You also got to hear the testimony of Miguel and Otilia, our two witnesses from the scene that night. *And perhaps their testimony has been tainted a little bit, too, influenced by fear,* maybe not wanting to get involved, maybe not wanting to tell us everything that they knew about the things that happened that night." (Emphasis added.)

The prosecutor further argued, "And so maybe some of their testimony was interesting. Some of it's been inconsistent. *Some of it maybe may have been influenced by different factors.*" (Emphasis added.)

This court has held that " '[w]hen a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury.' " *State v. Douglas,* 274 Kan. 96, 107, 49 P.3d 446 (2002) (quoting *State v. Pabst,* 268 Kan. 501, 507, 996 P.2d 321 [2000]).

Here, the prosecutor suggested that some testimony was inconsistent, which prosecutors are permitted to do. *Cf. State v. Finley,* 273 Kan. 237, 246, 42 P.3d 723 (2002) ("The prosecutor based her argument on an inference drawn from the nature of the defendant's conflicting stories, not on the prosecutor's knowledge of the defendant's veracity."); *State v. Elnicki,* 279 Kan. 47, 63, 105 P.3d 1222 (2005).

However, the prosecutor's argument that Otilia and Miguel may have been "tainted a little bit, influenced by fear, maybe not wanting to get involved, maybe not wanting to tell us everything that they knew" or "maybe . . . influenced by different factors" presents a tougher question. On the one hand, this argument could be seen as simply an explanation for the inconsistencies in their testimony. On the other hand, it could be seen as a prosecutor's forbidden "comment on the credibility of his or her own witnesses." *Elnicki*, 279 Kan. 47, Syl. ¶ 6.

We need not answer this particular question, however, because even if the prosecutor's suggestions fall outside the wide latitude authorized in closing arguments, Bryant's claim fails. He has not shown plain error, *i.e.*, he has not shown how the prosecutor's statements prejudiced him. While Otilia and Miguel's testimony was important, four officers testified about what these same witnesses told them when the events were fresher in the witnesses' minds. Under these circumstances, the prosecutor's statements did not prejudice Bryant and deprive him of a fair trial.

As for Bryant's third allegation, we agree with the State that he fails to specify which prosecutorial statements allegedly encouraged the jury to disregard evidence which supported the defense and allegedly encouraged the jury to improperly draw inferences from the evidence. We will not search the record and guess which specific facts he believes support his general allegations. *Powers v. Kindt*, 13 Kan. 74.

Issue 2: *The district court did not err in admitting evidence of Bryant's prior incarceration and in failing to give a limiting instruction.*

Bryant next argues that he was prejudiced by evidence that he had been "out" for 4 days before the crime. He claims that because the State's first witness, his mother Rosie, raised this issue in her testimony, he was then forced to testify about his release from prison. He did so repeatedly. Bryant argues we should apply the standards for admission and exclusion of other crimes and civil wrongs evidence under K.S.A. 60-455 as articulated in *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006).

Among other things, the State replies that Rosie's testimony was nonresponsive to the State's question and totally unexpected:

"Q: Now, did he [the defendant] ever live with you at [Rosie's home address]?

"A: Yes, when he came out, he was out four days. He lived with me those four days."

Rosie made three additional general references to Bryant's absence, and return, throughout her testimony, saying "[w]hen Tim came home," "[h]e had just been home for four days," and "[h]e had been out only four days . . . ."

Bryant further argues that the district court had previously ruled that the reason for his incarceration was inadmissible. We observe that the only motion in limine in the record is one filed by Bryant pro se. He does not direct us to anything in the record on appeal, however, to indicate that the court ever ruled on this motion or otherwise issued a ruling that he now claims was violated. It is Bryant's obligation to provide an adequate record on appeal and to direct us with specific references within such a record. See *State v. Holmes*, 278 Kan. 603, 612, 102 P.3d 406 (2004) (appellant's burden to furnish a record which affirmatively shows that prejudicial error occurred, without which the appellate court presumes the district court's action was proper); *State v. Drach*, 268 Kan. 636, 638, 1 P.3d 864 (2000) ("By rule, we are allowed to assume there is no evidence in the record to support that part of the case that is not properly keyed to the record."); Supreme Court Rule 6.02(d), (e) (2007 Kan. Ct. R. Annot. 37).

Although Bryant raises a number of other points to support his main argument, we need not address them or the State's numerous counter-arguments. We simply note that Bryant failed to object to his mother's testimony. "As a general rule, a party must make a timely and specific objection to the admission of evidence in order to preserve the issue for appeal." *State v. Stevens*, 285 Kan. 307, 326, 172 P.3d 570 (2007); see K.S.A. 60-404. Bryant has not argued that any exceptions to our general rule apply, nor do we observe any *sua sponte*. These particular evidentiary issues are therefore not preserved for appeal.

Bryant also generally claims that "statements to police were made while he was incarcerated and this evidence was admitted freely with no attempt to restrict the evidence of prior convictions or evidence of other crimes." It is unclear what Bryant is arguing here. He also makes generalized references to other purported inadmissible testimony, *e.g.*, concerning his drug use. He has not specifically identified these references or cited to the record, however. Accordingly, we do not consider these claims. See *Holmes*, 278 Kan. at 612; *Drach*, 268 Kan. at 638; *Powers v. Kindt*, 13 Kan. 74; Supreme Court Rule 6.02(d), (e) (2007 Kan. Ct. R. Annot. 37).

Issue 3: *The district court did not err in admitting the autopsy photographs.*

Bryant next claims that the district court erred when it admitted eight photographs from Gus' autopsy into evidence because they were "duplicative and gruesome." He argues that it was unnecessary to use photographs to explain the cause of death in this case.

The State responds that the photographs were relevant and helped establish the nature and extent of Gus' injuries. It also claims that the photographs were relevant to show the violent nature of the attack and to corroborate witness testimony.

Our standard of review is well known: The admission of photographs in a homicide case is a matter within the trial court's discretion. *State v. Torres*, 280 Kan. 309, 327, 121 P.3d 429 (2005).

Unfortunately, the photographs are not in the record on appeal. Accordingly, this court is unable to determine whether they are duplicative and gruesome. The consequences of this failure fall upon Bryant. See *Holmes*, 278 Kan. at 612.

We acknowledge that Bryant's counsel appended to his brief a document mailed to the clerk of the appellate courts and the Wyandotte County District Attorney requesting that certain documents, including the autopsy photographs, be added to the record on appeal. However, an appendix is limited to extracts from the record on appeal; it cannot serve as a substitute for the record itself. *Edwards v. Anderson Engineering, Inc.*, 284 Kan. 892, 895, 166 P.3d 1047 (2007); Supreme Court Rule 6.02(f) (2007 Kan. Ct. R. Annot. 37); Supreme Court Rule 6.03(e) (2007 Kan. Ct. R. Annot.

40). This court does not consider appended items which are not contained in the record. *Edwards*, 284 Kan. at 895. Even if this court did consider appended items, our review would be of little value here: Bryant's appendix merely lists the photographs by exhibit number; it does not contain them.

In response to questions at oral arguments before this court, Bryant's counsel stated she thought her motion to add to the record on appeal had been granted, suggested that the requested items were contained in the record on appeal, and indicated that she would investigate and subsequently inform the court. This court has heard nothing further.

Issue 4: *The district court did not err in instructing the jury.*

Bryant next argues that the district court made jury instruction errors. First, he is clear in claiming that the court erred in altering the pattern instruction on aggravated robbery, PIK Crim. 3d 56.31, to include the name of the victim. He contends that the instruction was somehow in error "because it required the jurors to determine that the defendant inflicted bodily harm on the victim in the course of intentional taking of property from the victim." The State responds that simply adding the name of the victim to the pattern instruction is not error.

Our standard of review is well known for when, as here, an objection has been made to instructions.

" ' "When reviewing challenges to jury instructions we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous." ' " *State v. Horn*, 278 Kan. 24, 42, 91 P.3d 517 (2004).

We readily conclude that the addition of the victim's name does not change the meaning of the pattern instruction and that the modified instruction is not erroneous.

Bryant is substantially less clear regarding a possible second argument, but seems to claim that if the aggravated robbery instruction needed the district court's clarifying alteration, then the aiding and abetting instruction needed clarification as well. He suggests

that the aggravated robbery instruction was given in conjunction with the aiding and abetting instruction and that, "[g]iven in tandem, the jury could have determined that [Bryant] was guilty of this crime because he aided another who committed any crime." The State responds that the instruction was an unmodified one contained in PIK Crim. 3d 54.05.

Bryant apparently did not object to the district court's giving of the aiding and abetting instruction. Accordingly, we must determine whether the instruction was "clearly erroneous." See K.S.A. 22-3414(3). "Instructions are clearly erroneous if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State v. Cooperwood*, 282 Kan. 572, Syl. ¶ 6, 147 P.3d 125 (2006).

The State correctly observes that the instruction given was an unmodified PIK Crim. 3d 54.05 instruction. Under the straightforward facts of this case, we fail to see that this constitutes error, our threshold consideration. See *State v. Hebert*, 277 Kan. 61, 87, 82 P.3d 470 (2004) (modifications or additions to PIK instructions should only be made if the particular facts of a case require it). Without error, it follows that the instruction cannot be clearly erroneous. See *State v. Sappington*, 285 Kan. 158, 165, 169 P.3d 1096 (2007).

Bryant additionally claims error because, "[t]he jury was instructed in such a manner that any evidence of a crime by codefendant [Anderson] would establish [Bryant's] guilt as to the robbery and subsequent death of the victim." Bryant seems to believe that the State must prove that he personally took money from Gus to convict him of felony murder. This, of course, is incorrect.

Our aiding and abetting statute, K.S.A. 21-3205, clearly states at subsection (1) that "[a] person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsel or procures the other to commit the crime." The instruction that was given in this case, PIK Crim. 3d 54.05, is patterned after this statute. It states:

"A person who, either before or during its commission intentionally (aids) (abets) (advises) (hires) (counsels) (procures) another to commit a crime with intent to

promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

As the Comment observes, this instruction was specifically approved 27 years ago in *State v. Minor*, 229 Kan. 86, 89, 622 P.2d 998 (1981).

We find no error in the jury instructions.

Issue 5: *The district court did not err in its read-back to the jury.*

Bryant next argues that the district court erred in not including the defense's cross-examination when it presented a read-back of certain testimony to the jury during deliberations. He claims that without the cross-examination, the jurors were allowed to place undue emphasis on certain portions of the testimony.

The State responds that the court read back all of the testimony requested by the jury, including parts of the cross-examination.

The jury's authority to request a read-back, and the trial court's obligation to comply with the request, is contained in K.S.A. 22-3420(3); see *State v. Myers*, 255 Kan. 3, 6, 872 P.2d 236 (1994). That statute states:

"After the jury has retired for deliberation, *if they desire to be informed as to any part of the law or evidence arising in the case,* they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or *the evidence shall be read or exhibited to them* in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney." (Emphasis added.)

While we have held that a trial court is required under the statute to accede to a jury's request to read back testimony, we have also held that the statute does not foreclose "all trial court discretion as to the manner of acceding to the request." *Myers*, 255 Kan. at 8. The trial court has the discretion to control the read-back. 255 Kan. at 8.

According to the jury's note contained in the record on appeal, it asked: "Can we hear the testimony of Det. Nepote and Huron [*sic*] (response unit detectives) regarding their interview with Otilia and Miguel?" The record reveals that transcript pages, identified by page number, were then read back. Defense counsel asked the

court—to "make a record"—if her cross-examination of Nepote had been read back. The court explained that defense counsel's questions on cross-examination dealt with what Otilia and Miguel had *not* said to the detective, rather than what they had said. The record is not clear on whether counsel was objecting or merely seeking clarification. In addition, the page references of the read-back in the transcript actually correspond with the testimony of not only Nepote and Herron, but also officers Sillings, Bundy, and Barajas.

The case of *State v. Juiliano*, 268 Kan. 89, 991 P.2d 408 (1999), provides guidance. There, the jury requested a read-back of " 'the testimony on the ballistics expert's finding on the three spent .357 Magnum shells found in the plastic bag' " in the defendant's home. 268 Kan. at 95. The defendant requested that the read-back include the cross-examination, as well as the direct examination, on the same subject. The trial court allowed only the direct testimony to be read back, concluding that the cross-examination had nothing to do with the examiner's testimony regarding the shell casings and that the jury's specific question would not be answered by any testimony contained within the cross-examination.

This court found no abuse of trial court discretion under those circumstances. We recognized that the jury made a specific read-back request; it did not request any additional testimony:

"The focus of the firearms examiner's testimony concerning his ballistic findings occurred only in the direct testimony. The cross-examination merely concerned the firearms examiner's ability to determine the identity of the person who fired the three bullets and the time they were fired. The judge took a narrow and focused question and provided the jury with exactly what they had asked for. There was no need to include cross-examination of the firearms examiner in the requested read-back." *Juiliano*, 268 Kan. at 95.

While the trial judge's decision in the instant case provides us with a closer call than the one that same judge made in *Juiliano*, we conclude on this unclear record that the court did not abuse its discretion in limiting the read-back.

Issue 6: *The district court did not err in denying Bryant's motion for new counsel.*

For Bryant's last claim, his brief alleges that the district court erred in denying his requests for new counsel. He complains that

the court made little inquiry into his requests. The State's brief primarily responds that the court made substantial inquiries and accordingly did not abuse its discretion in denying the requests.

At oral arguments, Bryant's appellate counsel recast Bryant's argument as essentially one of ineffective assistance of his trial counsel, KiAnn McBratney. She recited such purported McBratney deficiencies as failures to object to certain testimony; to offer a police report for admission into evidence; and to request a limiting instruction on alleged bad acts. Appellate counsel acknowledged our general rule that such claims cannot be brought for the first time on appeal where the district court has not had the opportunity to conduct the factual inquiry. See *State v. Gleason,* 277 Kan. 624, Syl. ¶ 5, 88 P.3d 218 (2004). She nevertheless invited us to conduct a de novo review of the record, citing *State v. Jenkins,* 257 Kan. 1074, 1080, 898 P.2d 1121 (1995).

We decline this invitation, especially because previously discussed deficiencies in the record on appeal cast considerable doubt on the reliability of the results of such a review. We instead review the issue as presented in Bryant's brief: error in denying his requests for new appointed counsel.

A district court's refusal to appoint new counsel is reviewed under an abuse of discretion standard, which asks whether any reasonable person would take the view adopted by the district court. *Sappington,* 285 Kan. 158, Syl. ¶ 4. The burden is on the party alleging the abuse. *State v. White,* 284 Kan. 333, 342, 161 P.3d 208 (2007).

Furthermore, to warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with appointed counsel. Justifiable dissatisfaction includes a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. *State v. McGee,* 280 Kan. 890, 894, 126 P.3d 1110 (2006). But ultimately, " '[a]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel. [Citation

omitted.]' " *State v. Ferguson,* 254 Kan. 62, 70, 864 P.2d 693 (1993) (quoting *State v. Banks,* 216 Kan. 390, 394, 532 P.2d 1058 [1975]).

Bryant's complaints were primarily based upon a lack of communication with McBratney and her failure to abide by his decisions for his defense. His appellate counsel also focuses on McBratney's purported conflict of interest due to Bryant's filing complaints against McBratney with the Disciplinary Administrator for the State of Kansas. In any event, a chronology of events on this issue is helpful.

On March 11, 2005, Bryant filed, pro se, his only written motion to change counsel. He alleged that he had not spoken with his attorney regarding witnesses to be interviewed and subpoenaed for preliminary hearing and trial; that she had not "consulted with him as to the means to pursue the issues and concerns regarding his defense"; that she "has failed to consult with [him] to abide by his decisions concerning the lawful objectives of her representation"; and that her decision to accept the appointment of his case violated "Rule 226, Model Rules of Professional Conduct . . . [a] lawyer shall not accept appointment of client or cause if it is so repugnant to the lawyer as to be likely to impair the client-lawyer relationship or the ability to represent the client."

On March 18, 2005, at the outset of the preliminary hearing, the State brought up Bryant's motion to change counsel. Neither the district court nor McBratney had seen a copy of it. McBratney denied Bryant's allegations, specifically referring to the jail visitation records to evidence her meetings with him. The district court, Judge Serra, denied Bryant's motion. Among other things, the court noted the problems caused by its late notice, the competence of McBratney, and the need for major case decisions to be made by those with legal training and understanding:

"Number one, I wasn't furnished a copy of this motion. The first I heard about it is right now when we've got all these witnesses here, two sets of attorneys, defendants. I will say this, that I have known Ms. McBratney for a number of years. She's tried many cases before me. She is extremely competent. And while certainly defendants are entitled to some input, major decisions in how to conduct cases need to be made by someone who had legal—a legal education and understands the process. I am not at this late date going to continue this case and inconvenience all of these people."

The court further noted that the issue, if Bryant desired to pursue it, could be taken up at a later time after proper notice:

"If you wish to re—after we have the preliminary hearing, if you still feel the same way where we can have a hearing with proper notice to all parties, either I or I assume it will be another judge can make that determination. But insofar as the preliminary hearing is concerned, that motion, while I did not receive it, nor did Ms. McBratney, I am going to overrule that motion, and we're going to try this preliminary hearing today, unless the State has other feelings."

After conclusion of the preliminary hearing, Bryant was then bound over for trial. According to McBratney's later statements to the court, she and Bryant met and resolved their differences.

Approximately 2 months after Bryant and McBratney resolved their differences, on May 18, 2005, the district court, Judge Burdette, held a hearing on several motions. These included Bryant's original pro se motion to change counsel and McBratney's recent motion to withdraw. The court stated that it had read Bryant's motion and asked if there was anything else Bryant wanted to tell the court about it. Bryant complained that he did not feel like he was getting a "fair deal," that McBratney was not responding to his letters, and that he and McBratney could not come to an agreement on how to handle his case.

McBratney responded that because of three formal complaints Bryant had filed against her, her motion to withdraw because of attorney-client conflict should be granted. To the best of her understanding, these complaints consisted of Bryant's March 2005 pro se motion, his complaint filed against her after the preliminary hearing with the Disciplinary Administrator's office, and his complaint filed against her with an unknown agency, all indicating she was not doing her job.

McBratney also informed the court that after a meeting with Bryant, he had indicated he was willing to withdraw his disciplinary complaint and pro se motion. She specifically advised that after the preliminary hearing, Bryant told her he was satisfied with her representation based upon the performance that he had observed. McBratney advised that Bryant essentially was dissatisfied because he did not get to make all the case decisions. She further indicated that the Disciplinary Administrator had written to her stating there

was nothing to investigate on Bryant's formal complaint. Bryant then complained that "I should be more informed on what she's planning on doing."

In response to questions from the court, McBratney stated that she had a conflict, but suggested that her ability to represent Bryant could be affected only "[i]f he continues to complain about me, which he's continuing to do." The following discussion then occurred:

"THE COURT: *I feel unless you tell me specifically that you can't do your best to represent this individual, I don't see any conflict.* I see an individual who's unhappy because, in effect, well, I'll just use a broad term, you haven't been as con —

"McBRATNEY: I haven't conceded to every wish of his.

"THE COURT: Okay. That sounds good. And I don't know Mr. Bryant's experience with the criminal justice system, but *even retained counsel doesn't jump through the hoops of every defendant.* I mean, you get who you get, Mr. Bryant. And, frankly, you have an experienced criminal defense attorney before you who has been through these types of cases before. I don't know how many murder cases you've been up for, don't know anything about your background, anything like that, but *I would hazard a guess that she has a better understanding of the law and the procedure than you do.* . . .

Legally the threshold I suspect is not—hasn't been met unless—let me ask you this question, Mr. Bryant. I mean, are you gonna—if I make Ms. McBratney, and I can order her to stay in this case, are you gonna cooperate with her to the best of your ability for your defense?

"DEFENDANT: Well, Your Honor, you just—you yourself you was the district attorney on my case before—on one of my cases before, so you know, you and I have had, you know, met across the table, you know. *My thing about Ms. McBratney is I feel that I should be more informed on what she's planning on doing.*

. . . .

"THE COURT: . . . I—I think and I suspect that you two need to do a little bit more communicating. But I have no doubts that Ms. McBratney has done her best to represent you thus far in this case. *I don't know that any attorney could have done anything differently up to this point.*" (Emphasis added.)

The court then concluded with its holdings on Bryant's basic complaints arising out of lack of communication as well as McBratney's conflict of interest:

"THE COURT:    *Well, I suggest that you folks put in the time to do the talking and the communicating about the case,* about your defense and there's plenty of time left to do that. *But I haven't heard anything yet that rises to the level that I have to remove her for a conflict in this case."* (Emphasis added.)

The court then denied both Bryant's motion to change counsel and McBratney's motion to withdraw "because she has indicated to me that she is still willing to do her best to represent you in this case despite the fact that you may still be complaining, you know, all the way up to an acquittal or a conviction." According to the hearing transcript, jury trial was set for Monday, May 23, 5 days later. Although the record is unclear, apparently the district court then rescheduled, presumably to give McBratney and Bryant more time·to meet and confer.

On August 22, 24, 25, and 26, 2005, the jury trial was conducted. Bryant made no further complaint about McBratney, *e.g.*, made no effort to request new counsel.

On November 18, 2005, the parties appeared for Bryant's sentencing. McBratney volunteered that Bryant's complaint against her with the Disciplinary Administrator had been dismissed as having no basis but that he had filed a second disciplinary complaint. She requested that the court determine if she would be allowed to continue to represent him through sentencing. When the court asked Bryant about McBratney proceeding with his sentencing, Bryant requested another attorney.

"DEFENDANT:    [I]f it's at all possible, I'd like to have another attorney.
"THE COURT:    I don't believe it's going to be possible for you here today. This is a sentencing in this matter. She knows the case. You've been in custody for—since, I believe, January of this year—
"DEFENDANT:    Yes.
"THE COURT:    — about the middle of it. We've had—gone through a trial. You filed one complaint. It has not been substantiated. If you feel that she has fallen down in her representation of you regarding the trial or the motion for new trial, then once you are sentenced, you will be free to raise those issues with the Appellate Defender and he will be assigned—he or she will be assigned to handle your appeal of everything in this case. And if you're alleging ineffective assistance of counsel, certainly that'll be considered by the Appellate Court. But as far

> as sentencing here today, there really isn't a lot that can be said or done regardless. *So unless you can give me something specific as to why she should not continue, she will.*
>
> "DEFENDANT: Well, I don't have no choice in the matter.
>
> "THE COURT: Well, *unless you can give me something specific as to why she's not qualified to represent you in this sentencing,* then she will proceed with the sentencing." (Emphasis added.)

When pressed, Bryant could not identify any specific reason. Judge Burdette made no specific inquiry into the nature of the first disciplinary complaint or of the nature and status of the remaining complaint. But he did find that Bryant had "told me absolutely nothing that rises to the level of a factual or legal basis to change counsel" and proceeded with the sentencing.

To begin our analysis, we note that in order to determine whether to appoint new counsel, the district court must conduct some type of investigation. See *Sappington,* 285 Kan. at 169. Here, the court satisfied this requirement at both the May 18 motions hearing and the November 18 sentencing hearing for Bryant's claims based upon poor communication by asking open-ended questions of Bryant to learn everything that was bothering him. It also fulfilled this requirement by fully hearing Bryant's complaints, *e.g.,* "I should be more informed," and by fully hearing Mc-Bratney's responses. The court observed that many decisions are necessarily left to defense counsel and McBratney was experienced. It suggested that they communicate more. Moreover, there is nothing in the record to indicate that Bryant complained about McBratney during the next 6 months—through a 4-day jury trial—until the day of his sentencing, indicating that he was satisfied with her during that period.

As for the conflict of interest claim based upon Bryant's filing complaints with entities outside the court, his appellate counsel admitted at oral arguments that the mere filing of disciplinary complaints is not enough to establish a conflict. The district court must still inquire. We agree. See *Vann,* 280 Kan. at 789 (" 'Where a trial court becomes aware of a possible conflict of interest between an attorney and a defendant charged with a felony, the court has a duty to inquire further.' ").

Our Court of Appeals addressed this issue and similar facts in *State v. Robertson*, 30 Kan. App. 2d 639, 44 P.3d 1283 (2002). There, as in the instant case, several months before trial the defendant filed a disciplinary complaint against his attorney who, shortly thereafter, moved to withdraw. Additionally, counsel told the district court there had been a "total breakdown in communication." The motion was denied.

On appeal, the defendant argued that the district court should have granted the withdrawal motion because his pending disciplinary complaint against his counsel created a per se conflict of interest. After reviewing case law from Kansas and other jurisdictions, the Court of Appeals rejected this argument. It held that the conflict must be actual. 30 Kan. App. 2d at 641-42.

The *Robertson* court held that whether a disciplinary complaint creates an actual conflict of interest depends upon the nature of the complaint:

"We recognize that an attorney's best defense to a disciplinary complaint is to provide the defendant with the best possible defense and, as such, a pending disciplinary complaint does not necessarily create a conflict of interest. However, we also recognize that under certain circumstances, a disciplinary complaint could create an actual conflict of interest, depending on the nature of the complaint." *Robertson*, 30 Kan. App. 2d at 644.

The Court of Appeals held that "the trial court failed to inquire into the basis of the disciplinary complaint." 30 Kan. App. 2d at 645. The court then observed that because of this failure, the question became whether an actual conflict of interest existed. 30 Kan. App. 2d at 649. The court determined from the facts in the record that the conflict was actual. These facts included a total breakdown in communication as well as evidence that counsel's actual answer to the disciplinary complaint would be contrary to her client's position in the present case. The court concluded the trial court abused its discretion in denying the motion to withdraw.

Here, unlike *Robertson*, the district court did inquire. During the May 18 inquiry, although discussion was sparse on the nature of the disciplinary complaint itself, the court learned that the Disciplinary Administrator had said there was nothing to investigate. Moreover, after discussion with Bryant and McBratney on the na-

ture of Bryant's overall concerns, the court stated that it did not see any conflict requiring her removal. During the November 18 inquiry, although similarly limited on the nature of the second disciplinary complaint itself, the record reveals that the court gave Bryant opportunities to be heard. Several times Judge Burdette asked Bryant to "give me something specific." And, certainly unlike *Robertson*, there is nothing in the record indicating what McBratney's responses to the complaints were, much less any indication that they "would be contrary" to any position she needed for defending Bryant.

The record on appeal contains none of the written complaints or responses. We acknowledge that Bryant's brief's appendix references several of his letters, allegedly addressed to the court clerk and McBratney. However, like the autopsy photographs mentioned in issue 3, no such letters are contained in the record on appeal. For the reasons given there, we are unable to consider them.

In light of the foregoing, the court had a reasonable basis for believing that the attorney-client relationship had not deteriorated to a point where McBratney could no longer effectively aid Bryant in the fair presentation of his defense. Bryant failed to show "justifiable dissatisfaction" with his counsel, *e.g.*, a complete breakdown in communications or an actual conflict of interest. Accordingly, while the better practice would have been for the court to make specific queries of McBratney and Bryant about the nature of the disciplinary complaints, instead of simply asking Bryant to specify why McBratney should not continue as his counsel, we cannot hold that no reasonable person would have agreed with the district court. It did not abuse its discretion in denying Bryant's motions.

Affirmed.