No. 83,217

STATE OF KANSAS, *Appellee*, v. CELESTER McKINNEY, *Appellant*.

(33 P.3d 234)

 *Opinion*
filed October 26, 2001. 

*Mary Curtis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Michael A. Russell*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Celester McKinney appeals from his conviction of premeditated first-degree murder in the death of Greg Miller. He contends (1) the trial court erred in denying his motion for new trial based on newly discovered evidence, (2) the prosecutor committed misconduct in presenting false witness testimony, (3) the trial court erred in responding to a jury question when the defendant was not present, (4) the trial court erred in admitting certain hearsay statements, and (5) the prosecutor's closing argument violated his constitutional rights. Finding no reversible error, we affirm.

Celester McKinney, his brother Dwayne McKinney, and his cousin Brian Betts were all charged with first-degree premeditated murder of Greg Miller. Based upon a pretrial motion to sever, the defendant, his brother, and his cousin were granted separate trials. Defendant Celester McKinney was found guilty, and we deal with his appeal in this case. Brian Betts was also found guilty, and his appeal was decided by this court in *State v. Betts*, No. 84,112, filed this date. Dwayne McKinney was found not guilty.

The major players involved in this appeal are Celester McKinney, Dwayne McKinney, and Brian Betts. The main witness for the prosecution was Carter Betts, who is the uncle of the three codefendants. Jimmy Spencer, Jr., uncle of the victim, also testified on the part of the State. Other witnesses who testified at trial are identified below.

In the early morning hours of December 29, 1997, police in Kansas City, Kansas, responded to a report of shots fired, finding the body of Greg Miller. Greg had been shot 18 times with both a shotgun and a rifle. A trail of blood led to the body. Spent 12-

gauge shotgun shells and empty rifle shell casings were found near the body. A cleaning rod from a rifle was also discovered near the scene.

Alfred Burdette, Jr., the person who reported the shots, testified he heard gunshots at approximately 3 a.m. He looked outside and saw a person walking and firing a gun. Another person on the other side of the street was also firing. At first, Burdette thought the persons were shooting at each other but then he noticed they both ran off together in the same direction. Burdette testified at trial he saw one of the shooters enter the rear gate at 2917 N. 5th. He stated the person went to the door, hesitated, and went in. Officer Keto Thompson, who was one of the officers responding, testified that he talked to Burdette. According to Officer Thompson, Burdette said the person went between the houses but Burdette did not know whether the person had actually gone into the house in question.

Carter Betts provided the testimony linking the defendant to the crime. According to Carter's testimony, his three nephews: the defendant, Dwayne McKinney, and Brian Betts, lived with and worked for him. The Betts family owns the house at 2119 N. 5th, which is divided into several different apartments.

Carter testified that he, the defendant, and Dwayne were cleaning a building on the night in question and returned home between 11:30 p.m. and midnight. Carter went to sleep, while the defendant and Dwayne watched television. At approximately 3 a.m., Carter heard a number of gunshots. He testified he then heard the front door open and close. He went downstairs to investigate and found the defendant, Dwayne, and Brian. A pistol-grip shotgun and an assault rifle lay at the feet of Dwayne and Brian.

According to Carter, when he asked what happened, the defendant replied: "We shot that Greg." The defendant explained to Carter that they suspected Greg of breaking into and burglarizing Brian's apartment. The defendant told Carter he had gone to talk to Greg and brought him back into the alley behind the house. When Greg denied breaking in, Dwayne raised a gun to shoot him. However, the gun jammed and Greg began to run away. At this point, the defendant told Dwayne and Brian to stop Greg because

they could not let him live to be a witness. Dwayne and Brian began firing. Their shots knocked Greg down. The defendant told Carter that Brian then went over to Greg and finished him off.

Carter testified that when the police questioned him regarding the incident, he told them his nephews had been in bed asleep at the time the shots were fired. Later, however, the police questioned him at the station and he changed his story. Carter stated that he decided to tell the truth because the word on the street implicated him in the murder and he was scared.

Carter stated that he was testifying under duress, as it was difficult to testify against his nephews. On cross-examination, he admitted signing a letter stating he wanted to "discredit" his testimony. He stated his sister, the defendant's mother, typed the letter for him to sign. He stated he signed the letter because he did not want to testify.

Jimmy Spencer, Jr., also provided information linking the defendant to the crime. He stated he woke up around 3 a.m. in order to get something to eat and found the soda pop he put in the refrigerator was gone. He woke Greg, who was living with him, and asked him if he had taken the soda pop. Greg confirmed he had, so Spencer sent Greg out to buy a soda pop from a nearby machine. When Greg returned, he told Spencer that a person named Les wanted to talk to him. Spencer testified that he thought Greg was referring to the defendant, Celester McKinney, as Les. Greg left to find out what Les wanted. Spencer stated that he heard gunshots a few minutes later. He looked out the window and saw someone shooting toward the ground. Spencer dressed and went to investigate whereupon he found Greg's body. Soon after, the police arrived.

On the basis of this evidence, the defendant was convicted of first-degree premeditated murder. He filed a motion for a new trial which was denied, and then a notice of appeal. Soon after, the defendant filed a motion for a new trial based on newly discovered evidence. The defendant's motion alleged Carter had recanted his testimony during a posttrial hearing in Brian's trial, which was based on the same incident. The defendant's motion also alleged the district attorney had suborned perjury in the defendant's case,

both from Carter and also from Officer Thompson concerning what Burdette told him the night of the incident. Because the defendant had already filed his notice of appeal, this court remanded the matter to the trial court for a hearing on the motion.

Initially, Officer Thompson testified concerning Burdette's statement. Officer Thompson confirmed he testified at trial that Burdette said he did not know if the shooters had gone into the house. He also testified his report stated Burdette told him the shooters ran down the alleyway between the two houses.

The hearing then moved to Carter's recantation. Carter testified that after the first interview during which he told the police he had gone back to sleep after hearing gunshots, the police kept pressing him. Carter stated the story he told police about his nephews being involved in the shooting was a lie and was based on what police had told him about the murder and what he had heard around the neighborhood. He testified that he had lied because he was afraid he might be connected to the murder.

Carter stated that the night before the preliminary hearing in the defendant's case, he met with prosecutor Daniel Cahill and Cahill told him what his testimony should be. Carter stated that during Dwayne's trial, he testified he was lying, at which point the prosecutor asked for a recess. According to Carter, Cahill threatened him during this recess.

Carter testified that the truth was that he had heard the gunshots but went right back to sleep. He testified he did not know who killed Greg.

Prosecutor Cahill testified on behalf of the State at the hearing. He stated that while he had talked to Carter the night before the preliminary hearing, he did not coach him as to how to testify. He stated Carter was jittery and did not want to testify but that Carter never stated his testimony would not be true. Cahill also stated Carter told him prior to the defendant's trial that Cahill should not call him to testify because Cahill would not like what would happen. Regarding the incident during Dwayne's trial, Cahill testified it occurred during a motion prior to trial and Carter simply stopped answering questions. Cahill testified that a recess was taken and he

met with Carter and Carter's mother. Cahill denied threatening Carter.

The State also presented the testimony of Ray McKinney, a Kansas City, Kansas, police officer. Ray is the defendant's uncle. Ray stated he received a telephone call from Patricia Betts, who is the defendant's mother. Patricia told Ray she thought her boys were involved in the Greg Miller murder.

The trial court found Carter's recantation was not credible. The court further found that the prosecutor did not present perjured testimony at trial. Accordingly, the trial court denied the defendant's motion for new trial.

Denial of New Trial—Recanted Testimony of Carter Betts

Carter's testimony not only linked the defendant to the crime but provided the basis for the defendant's conviction. Without his testimony there would have been no evidentiary basis for the defendant's murder conviction. After trial, Carter recanted his trial testimony, thus providing the defendant with new evidence that, if believed, would exonerate him. The trial court, upon hearing the defendant's motion for new trial, concluded Carter's recantation was not credible and provided no basis for a new trial.

K.S.A. 22-3501 provides that a court may grant a motion for a new trial based on the ground of newly discovered evidence. There is a two-part test for determining whether a new trial is warranted based on newly discovered evidence. First, the defendant must establish that the newly proffered evidence is indeed "new," in that it could not, with reasonable diligence, have been produced at trial. Second, the evidence must be of such materiality that there is a reasonable probability that the newly discovered evidence would produce a different result upon retrial. *State v. Moncla,* 269 Kan. 61, 64, 4 P.3d 618 (2000). The granting of a new trial is a matter within the discretion of the trial court. *State v. Reed,* 256 Kan. 547, 560, 886 P.2d 854 (1994).

While the State argues that the recanted testimony of Carter was not newly discovered evidence primarily because the defendant knew Carter's trial testimony was false at the time given, it is clear that until Carter recanted his testimony after trial, the defendant

could not have known about the recanted testimony. We conclude that the recanted testimony of Carter was newly discovered and could not, with reasonable diligence, have been produced at trial.

New trials on grounds of newly discovered evidence are not favored, and such motions are to be viewed with caution. *State v. Thomas*, 257 Kan. 228, Syl. ¶ 2, 891 P.2d 417 (1995).

The standard applied by the trial court for granting a new trial based on recanted testimony is well established. Where a new trial is sought on the basis of recanted testimony of a prosecution witness, the weight to be given such testimony is for the trial court to determine. The trial court is required to grant a new trial only when it is satisfied the recantation of the witness' testimony is true and material. Appellate review of an order denying a new trial is limited to whether the trial court abused its discretion. See *State v. Norman*, 232 Kan. 102, 109, 652 P.2d 683 (1982).

In claiming that the trial court abused its discretion, the defendant argues it was logical for Carter to place the blame on his nephews because the talk in the neighborhood was that Carter was somehow involved. The defendant argues Carter was a logical suspect because he owned the house that the victim was alleged to have burglarized and one shooter was allegedly seen entering. He also argues Carter was pressured by police, threatened with prosecution, and could not have known that his testimony would provide the only evidence against his nephews. The defendant also argues that Carter's original testimony was not credible because he testified that the front door to his house had been opened, while Burdette testified he saw one of the shooters enter through the back door of the house.

The evidence produced upon hearing established that Carter was under pressure from his family to recant. As mentioned, the defendant's mother facilitated Carter's attempts to discredit his testimony by typing the letter for him to sign. Further, the trial court had the opportunity to observe Carter's testimony on approximately six occasions during the course of three trials. The court found that Carter's demeanor was not one of someone forced to give false testimony because of a threat of prosecution, but it was the demeanor of someone who was reluctant to implicate his

nephews. The defendant fails to establish that the trial court abused its discretion in concluding Carter's recantation was not credible. We conclude the trial court did not err in denying the defendant's motion for a new trial based upon the recantation.

Perjured Testimony

The defendant also contends the prosecutor presented perjured testimony through Carter and Officer Thompson, and his conviction must be reversed for that reason. A conviction obtained by the introduction of perjured testimony violates a defendant's due process rights if (1) the prosecution knowingly solicited the perjured testimony, or (2) the prosecution failed to correct testimony it knew was perjured. *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959). However, the defendant in this case failed to establish the testimony was in fact perjured.

While the defendant claimed Carter repeatedly told the prosecutor his testimony was false, the prosecutor denied Carter made any such representation. The trial court found that Carter testified truthfully and that it was his recantation that was not credible.

The defendant alleges Officer Thompson's testimony was perjured because it differed from his written report. At trial, Thompson testified Burdette told him one of the shooters ran into the alleyway between Carter's house and another house and that Burdette did not know if the shooter went inside the house. Thompson's report stated only that Burdette told him that the shooter ran down the alleyway. However, because Thompson failed to record Burdette's statements regarding whether the shooter went inside the house does not mean Burdette did not make the statement. The evidence establishes that Thompson was a rookie officer at the time of the incident and his report may not have been complete. Further, Burdette testified he told Thompson the shooter did in fact go into the house.

Based upon the record, the evidence fails to establish that the prosecutor presented false testimony.

Presence of the Defendant for Jury Question

The defendant also argues the trial court erred in conducting a read-back of testimony requested by the jury. He contends the trial

court violated his constitutional rights by clarifying the jury's request outside of his presence. The further argues the read-back ultimately approved by the trial court distorted the testimony.

During deliberations, the jury sent a note to the trial court which requested "Carter Betts' statement(s) about the conversation in the basement." The trial court, outside the presence of the defendant and attorneys, directed the bailiff to ask the jury to be more specific. The jury responded: "We want the trial testimony of Carter Betts' conversation in the basement. Also the testimony of Carter Betts' preliminary hearing of the conversations in the basement." The trial judge proposed (1) to read back to the jury the portions of Carter's testimony on direct and cross-examination concerning the conversation in the basement, (2) to inform the jury that the preliminary hearing testimony had not been introduced in the case, and (3) to ask the jury if that addressed their question.

Defense counsel strenuously objected, arguing that the jury actually wanted Carter's testimony as well as the statement he made to police. That statement was substantially similar to Carter's testimony except that he did not tell police the defendant went to get Greg, the victim. Defense counsel contended that because he had stressed the difference between the statement and the trial testimony in closing, this was undoubtedly what the jury wanted.

The record confirms the defendant's contention that defense counsel did indeed stress the difference between Carter's statement and testimony in discussing Carter's credibility and the defendant's culpability. This emphasis supports the contention that the difference between Carter's statement and the testimony was an important issue for the defendant. However, the trial court went to great lengths to determine what evidence the jury actually wanted read back. A trial court has the discretion to clarify the jury's read-back request where it is unclear. *State v. Juiliano*, 268 Kan. 89, 94, 991 P.2d 408 (1999). Contrary to the defendant's assertion, the jury confirmed its interest in the actual testimony regarding the incident in the basement and did not reference the defendant's statement to police despite being given every opportunity to do so. While it was clearly error for the trial court to

attempt to clarify the request outside the presence of the defendant and his counsel, under the circumstances, the error was harmless.

The trial court determined it would follow its proposal and read back Carter's testimony. The trial court explained to the jury that the testimony from the preliminary hearing was not admitted into evidence and Carter's direct and cross-examination would be read back. The trial court then asked the foreman of the jury: "Is that what you want to hear?" The foreman replied that it was. The trial court then asked: "Is there anything else that you wanted to hear that was contained in this note?" The foreman answered: "No. I think you touched on the two things we want to hear, Mr. Betts' testimony what happened--what he said in the basement, his testimony and the two lawyers were talking." The trial court then clarified: "The direct examination?" The foreman stated: "Right, exactly, sir." The court again clarified: "When Mr. Cahill asked him questions and then when Mr. Burmaster cross-examined, that's the testimony that you were interested in hearing?" The foreman replied: "Yes, sir." Following the read-back, the trial court again asked if the read-back satisfied the jury's question. The foreman answered: "I believe that's sufficient, Your Honor."

The defendant's first complaint with the trial court's procedure is that the trial court communicated with the jury outside his presence when it sent the bailiff in to ask the jury to clarify its original request. K.S.A. 2000 Supp. 22-3405, as well as the Sixth Amendment Confrontation Clause and the Fourteenth Amendment Due Process Clause of the United States Constitution, require the defendant's presence at every critical stage of a trial, including whenever the trial court communicates with the jury. *State v. Bell*, 266 Kan. 896, 919-20, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999). Similarly, K.S.A. 22-3420(3) requires that once a jury has begun deliberations, any questions concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence, unless the defendant is voluntarily absent. 266 Kan. at 919. Under such circumstances, the defendant was required to be present, and the trial court's failure to do so violated the defendant's constitutional right to be present. 266 Kan. at 919-20.

This issue is subject to the harmless error analysis. Thus, the error will be declared harmless if this court concludes that the error had little, if any, likelihood of having changed the result of the trial. 266 Kan. at 920.

The defendant argues had he been present, he might have suggested a response that would clarify whether the jury actually wanted to compare Carter's statement to the police with his testimony at trial. He contends the response by the trial court unduly emphasized the trial testimony rather than the statement and might have persuaded the jury from abandoning its request for his statement to police. According to the defendant, his statement was critical because it did not suggest that he went to get Greg and, therefore, reduced his culpability for the crime and could have resulted in his acquittal. The defendant argues that his defense counsel stressed the difference between Carter's statement and testimony at closing, which showed its importance.

These arguments notwithstanding, we are convinced the trial court went to great lengths to provide the jury with the information it requested. Error is established, but under the circumstances, it was harmless.

## Hearsay Statements Under K.S.A. 2000 Supp. 60-460(l)

The defendant also argues the trial court erred in admitting the hearsay statements allegedly made by the victim before his death, wherein the victim allegedly told his uncle that Les wanted to talk to him. The defendant contends the State failed to show the statements bore sufficient indicia of reliability.

At issue is Greg's statement to his uncle, Jimmy Spencer, that Les wanted to talk to him and he was going to see what Les wanted. Spencer introduced this statement. The statement is important because it connects the defendant to Spencer's testimony that indicated the Les to whom the statement referred to in the plan to lure Greg out of the house was the defendant. Prior to trial, the defendant filed a motion in limine to prevent the State from presenting Greg's statement on the grounds that it did not fall within an exception and did not bear sufficient indicia of reliability. At the hearing, defense counsel asserted the statement did not bear suf-

ficient indicia of reliability because Spencer was not reliable. However, the trial court ruled the statement admissible pursuant to K.S.A. 2000 Supp. 60-460(l), as evidence of Greg's "existing state of mind and as to what he was doing and where he was going and things of that nature." At trial, defense counsel renewed his objection but was overruled.

K.S.A. 2000 Supp. 60-460(l) provides an exception to the hearsay rule for statements of physical or mental condition, including the declarant's existing state of mind and statements of intent, plan, and motive. The defendant does not dispute that the physical or mental condition exception applies to Greg's statement. However, the Confrontation Clause of the United States Constitution, as well as § 10 of the Kansas Constitution Bill of Rights, also establishes other requirements with regard to hearsay. In *State v. Bratt*, 250 Kan. 264, Syl. ¶ 1, 824 P.2d 983 (1992), we stated:

"The Confrontation Clause operates in two ways when determining the admissibility of hearsay statements. First, the Sixth Amendment establishes a rule of necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception. If the evidence does not fall within a firmly rooted hearsay exception, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness."

The defendant claims K.S.A. 2000 Supp. 60-460(l) is not a firmly rooted hearsay exception, citing generally *State v. Todd*, 24 Kan. App. 2d 796, 803, 954 P.2d 1, *rev. denied* 264 Kan. 824 (1998). *Todd* does not stand for this proposition. Instead, the question in *Todd* was whether the exception in K.S.A. 60-460(l)(2), allowing certain doctor-patient communications for the purpose of treatment, extended to statements relative to the cause of the victim's injury. The Court of Appeals ruled it could not under the plain language of the statute. 24 Kan. App. 2d at 804. Whether the hearsay exception was firmly rooted was not at issue.

While this court has not expressly addressed the question, other courts that have done so have ruled that the state of mind exception

to hearsay, such as found in K.S.A. 2000 Supp. 60-460(l), is a firmly rooted hearsay exception. See *Lenza v. Wyrick,* 665 F.2d 804, 811 (8th Cir. 1981); *Moore v. Reynolds,* 153 F.3d 1086, 1107 (10th Cir. 1998); *Wyatt v. State,* 981 P.2d 109, 115 (Alaska 1999); *State v. Wood,* 180 Ariz. 53, 64, 881 P.2d 1158 (1994); *People v. Waidla,* 22 Cal. 4th 690, 725, 94 Cal. Rptr. 2d 396, 996 P.2d 46, (2000); *Forrest v. State,* 721 A.2d 1271, 1277 (Del. 1999); *Baker v. State,* 332 Md. 542, 556, 632 A.2d 783 (1993); *State v. Jackson,* 348 N.C. 644, 654, 503 S.E.2d 101 (1998). We conclude that the state of mind exception to hearsay under K.S.A. 2000 Supp. 60-460(l) is a firmly rooted hearsay exception, and there was no need for the court to determine whether the statements bore particularized guarantees of trustworthiness. The trial court did not err in admitting the statements under K.S.A. 2000 Supp. 60-460(l).

## Prosecutorial Misconduct

The defendant's final argument is that the prosecutor committed misconduct during his closing argument. He contends the prosecutor improperly told the jury the defendant failed to come forward with testimony discrediting Carter and this conduct improperly shifted the burden of proof to the defendant.

Our standard of review with regard to prosecutorial misconduct is well known. An appellate court's analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process: First, the appellate court must determine whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. Second, the appellate court must determine whether the remarks constituted plain error; that is, whether they were so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. In order to find that the remarks were not so gross or flagrant, the court must be able to find that when viewed in light of the record as a whole, the error had little, if any, likelihood of changing the result of the trial. *State v. McCorkendale,* 267 Kan. 263, 278-79, 979 P.2d 1239 (1999).

"It is the duty of a prosecutor in a criminal matter to see that the State's case is properly presented with earnestness and vigor and use every legitimate means

to bring about a just conviction, but he should always bear in mind that he is an officer of the court and, as such, occupies a quasi-judicial position whose sanctions and traditions he should preserve. [Citation omitted.]" *State v. Ruff*, 252 Kan. 625, 634, 847 P.2d 1258 (1993).

None of the complained of remarks by the prosecutor in this case were objected to by the defendant. Kansas does not ordinarily apply the plain error rule, and reversible error normally cannot be predicated upon a complaint of misconduct by the prosecutor during closing argument where no contemporaneous objection is lodged. However, if the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. *McCorkendale*, 267 Kan. at 278.

The defendant complains of two instances of improper remarks by the prosecutor. The first occurred during the first half of the prosecutor's closing, wherein the prosecutor stated:

"He talks about evidence, lack of evidence and conflicts of evidence. Ladies and gentlemen, the evidence is Carter Betts. The evidence is Carter Betts. *There is nothing that conflicts Carter Betts*. Carter Betts gives you the entire evidence and that's the evidence." (Emphasis added.)

While the defendant argues the prosecutor was implying to the jury that the defendant had failed to produce evidence to rebut Carter's statement, a close reading reveals the prosecutor was actually stating that there was no conflicting evidence. Instead, the prosecutor was arguing the only evidence was from Carter, and was conclusive, if believed. This was not an attempt to shift the burden of proof and did not constitute misconduct.

The second complained-of instance is more problematic. In the second half of his closing argument, the prosecutor stated:

"Carter Betts, ladies and gentlemen, sat on this witness stand. You saw him up here. Did he look nervous, did he look scared? Did he look sad? That's for you to determine. That's the man you saw up there, was he telling you the truth? Is he out to get his nephew? And if he is out to get his nephew, why is he out to get his nephew? *If [defense counsel] had a real reason why Carter Betts would lie to you, he would not only have said it, he would have said, well, yeah, maybe he was saving his own skin, that sounds like a motive to me and then move on to everything else. You know what he would have been doing? Pounding on the bar saying,*

*ladies and gentlemen, he's lying because this is why he's turning his nephews in, this is why he's saying he did it. He can't do that because Carter Betts doesn't have a reason.*

*"They've since this case has been filed, they've had one job, find out why Carter Betts is lying, one job the entire time, months and months since December 29th, find out and give the jury a reason why Carter's lying. They cannot do it. If they could do it because they have to do it, otherwise you know Carter's telling the truth and you know that Les McKinney is a murderer. They can't do it. If they could have, ladies and gentlemen, you would have heard nothing else from them."* (Emphasis added.)

The remarks by the prosecutor suggested to the jury that the defense had the responsibility to rebut Carter's statements and they failed to do so because Carter was telling the truth. The defendant contends these remarks were impermissible because they implied a burden of proof he did not have. However, it has been held that where the jury has been properly instructed the prosecution has the burden of proof, a prosecutor may argue inferences based on the balance or lack of evidence, provided that the remarks do not indirectly draw an adverse inference regarding the defendant's failure to testify. *U.S. v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990); *U.S. v. Sblendorio*, 830 F.2d 1382, 1391-93 (7th Cir. 1987); *United States v. Fleishman*, 684 F.2d 1329, 1343 (9th Cir. 1982). The Seventh Circuit Court of Appeals in *Sblendorio* stated that a prosecutor commenting that his evidence was uncontradicted or on the failure of the defendant to produce witnesses does not actually change the burden because the jury has been instructed that the burden remains with the prosecution. Instead, where such occurs, "the defendant['s] real complaint is that a given argument may adversely affect the exercise (or value of) a constitutional right, such as the privilege against compulsory self-incrimination." 830 F.2d at 1391. The court went on to state:

"The defendant's decisions about evidence other than his own testimony do not implicate the privilege, and a comment on the defendant's failure to call a witness does not tax the exercise of the privilege. It simply asks the jury to assess the value of the existing evidence in the light of countermeasures that were (or were not) taken. The inferences come from the evidence before the court. . . . As a result, the prosecutor may imply that the failure of the defense to present available evidence (other than the defendant's testimony) in opposition to the government's

witnesses supports a conclusion that the government's witnesses are reliable." 830 F.2d at 1391-92.

Thus, the question is whether the prosecutor's comment in this case could be construed as a comment on the defendant's failure to testify. The Fifth Amendment to the United States Constitution, as well as § 10 of the Kansas Constitution Bill of Rights, prohibits a prosecutor from making direct, adverse comments on a defendant's failure to testify on his or her own behalf. *Griffin v. California,* 380 U.S. 609, 615, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965); 249 Kan. 15, 21, 815 P.2d 519 (1991). An indirect comment may also violate the privilege where the language used was manifestly intended or was of such a character that the jury would necessarily take it to be a comment on the failure of the accused to testify. *State v. Ninci,* 262 Kan. 21, 48, 936 P.2d 1364 (1997).

In *Milo,* we quoted *State v. DiCaro,* 852 F.2d 259, 263 (7th Cir. 1988), for the proposition that " '[a] prosecutor's assertion that evidence is uncontradicted is impermissible only if it is highly unlikely that anyone other than the defendant could rebut the evidence.' " 249 Kan. at 21-22. The same standard applies to a prosecutor's comment on the failure of the defendant to present evidence or call witnesses. *U.S. v. Butler,* 71 F.3d 243, 254-55 (7th Cir. 1995).

In the case at hand, the prosecutor was not inferring that the defendant did not testify to rebut Carter's testimony, but only that the defense had failed to produce evidence in general that would cast doubt on Carter's credibility. It was not unlikely that anyone other than the defendant could rebut the evidence presented; therefore, the statements would not necessarily be taken as a comment on the failure of the defendant to testify. Under *Milo, DiCaro,* and *Sblendorio,* this comment was proper.

As the State points out, the prosecutor's closing arguments were in response to defense counsel's closing argument wherein defense counsel argued that Carter was lying to protect himself. We have held that there is no prejudicial error when questionable remarks made by a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel. *State v. Follin,* 263 Kan. 28, 45, 947 P.2d 8 (1997); *State v. Sexton,* 256

Kan. 344, 363, 886 P.2d 811 (1994); *State v. Baker,* 249 Kan. 431, 446, 819 P.2d. 1173 (1991). We conclude that no prejudicial prosecutorial misconduct occurred in this case.

Affirmed.