NOT DESIGNATED FOR PUBLICATION

No. 127,488

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

FRED ALTON EVERETT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; CHRISTOPHER MAGANA, judge. Submitted without oral argument. Opinion filed May 22, 2026. Affirmed.

*Andrew J. McGowan*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before MALONE, P.J., BRUNS and HURST, JJ.

PER CURIAM: Fred Alton Everett appeals his convictions and sentences for three counts of aggravated indecent liberties with a child and one count of aggravated indecent solicitation of a child. Everett claims that the prosecutor committed multiple instances of prosecutorial error and that the district court erred in sentencing him without realizing it could grant his motion for a durational departure. After thoroughly reviewing the record and considering the parties' arguments, we affirm the district court's judgment.

1

Everett faces allegations that he sexually abused his girlfriend's two minor children, referred to by the parties as pseudonyms, Hazel and Kevin. We must review the facts in detail to address the issues presented in this appeal. Hazel and Kevin are half-siblings who share the same mother. The parties refer to Everett's girlfriend, the children's mother, as the pseudonym Sandy. Kevin and Hazel both split time between their fathers' houses in Great Bend and Sandy and Everett's house in Goddard. In August 2020, Hazel reported to her now stepmother that Everett had been sexually abusing her and Kevin. Hazel's father reported the accusation to law enforcement officers.

Hazel was forensically interviewed by Tabitha Schenk on August 24, 2020, where she described how Everett would have her "touch his bad parts" and tried to have sexual intercourse with her. Hazel described the first instance where Everett asked her to touch his penis and he touched her vagina in the living room. Another time after Hazel had just showered and was returning to her room to change, Everett called her into his room and was watching "sex videos." He told Hazel to lie on the bed if she wanted to have sex with him. Hazel watched a video with Everett, and after it ended he "just a little bit tried to push [her] down." Hazel resisted the push, to which Everett responded that she could leave. Another time while Hazel was in her room watching television, Everett came into the room, pulled her desk chair out, and "made [Hazel] touch his penis." Hazel described how Everett did this "five or more" times. Other times Everett would pull the shower curtain back to see Hazel while she showered. Hazel described Everett asking to see her breasts in exchange for his permission to watch a movie before bed.

Hazel also disclosed how Kevin told her that he had been "having to suck [Everett's] penis." Hazel described that she knew this occurred on many occasions in Everett's closet, Hazel's and Kevin's shared room, and the living room. Sometimes Hazel

2

heard Everett "make noises" like a "hard panting" while he abused Kevin, which she also described hearing when Everett abused her.

During Kevin's forensic interview with Kasey Dalke, recorded August 19, 2020, when he was 10 years old, he described how Everett would take him into his closet and touch his "front part," to which Kevin indicated on a diagram that he was referring to his penis. Everett would make Kevin touch Everett's penis as well. Kevin described that sometimes stuff would come out of Everett's penis and fall onto the carpet where it would dry up. Kevin disclosed that Hazel knew what Everett did to him because it used to happen to her, and she would cry when it happened. When asked what he thought should happen to Everett, Kevin responded that "he should go to jail for a long time."

On September 14, 2020, the State charged Everett with four counts of aggravated indecent liberties with a child and one count of aggravated indecent solicitation of a child. The charges were filed in Sedgwick District Court where Goddard is located. Before trial, the State moved for the admission of evidence under K.S.A. 60-455. The State sought to admit evidence pertaining to Everett's alleged sexual abuse of three other children along with several jailhouse telephone calls where the State alleged Everett tried to convince his sister to get Sandy to have the children change their stories, and where on another occasion Everett told Sandy that she should have her mother and sister talk to the children to change their stories. The district court granted the motion as to the jailhouse calls without objection. The district court also granted in part the motion as to two of the three allegations of sexual abuse against other children but denied the motion as to the remaining allegation against a third child.

A jury trial began on November 27, 2023. The State admitted into evidence both children's forensic interviews and recordings of the two jailhouse calls described above. The State also admitted into evidence many pictures including images showing Everett's closet with a blacklight revealing numerous stains on the carpet. The State admitted other

3

photographs of the children's bedroom carpet illuminated by a blacklight revealing more stains. The patches of carpet in both rooms where stains were found were cut out and forensically examined. A forensic analysis revealed sperm cells on 5 out of the 12 carpet samples tested. The DNA from the samples was matched to Everett's DNA profile with a 1 in 541 septillion chance that it could belong to someone unrelated.

Hazel and Kevin both testified at the trial. The State's other witnesses included Dalke and Schenk; Kevin's father; responding and investigating police officers; and forensic scientist Therese Gibler. These witnesses largely provided foundation and ancillary support for the children's forensic interviews and testimony, the DNA testing conducted on the carpet sections, and the investigation generally.

At the close of the State's case-in-chief, Everett moved for judgment of acquittal "primarily to Count I," which related to the first time he was alleged to have touched Hazel's vagina. Everett argued that in Hazel's forensic interview, she stated the abuse associated with Count I happened in Goddard, but in her testimony she alleged that it happened in Great Bend. The district court acknowledged the discrepancy but denied the motion finding that the jury could still find Everett guilty on Count I beyond a reasonable doubt based on Hazel's forensic interview.

Everett called Sandy to testify in his defense. Sandy testified that Everett was largely responsible for the children's discipline and she felt the children resented him for that. When asked about the stained carpet in the closet and whether she and Everett ever had sexual intercourse in the closet, Sandy said, "Yes." Sandy also claimed to have had sex with Everett in the children's room once around 2018.

Everett testified in his own defense. He described being the "disciplinarian" in the house. After disciplining Hazel, she would sometimes comment that she wanted to live with her dad. Everett denied inappropriately touching either child or forcing them to

4

inappropriately touch him. He denied asking Hazel to have sex with him. Everett denied watching pornography. He also described a time when he threatened to send Hazel to military school after she had been acting up. After that, the next time Hazel returned from her father's house, Everett described how she and Kevin would talk but get quiet as he passed by. When asked to "read between the lines" about that conduct and whether he was saying the children "sat down and concocted this whole thing," Everett eventually responded, "Yes." Everett claimed he and Sandy had sex in their closet multiple times. Everett agreed he and Sandy had sex in the children's room one time around 2018.

After the close of evidence, Everett renewed his motion for judgment of acquittal on Count I on the ground that the State did not present evidence that the crime occurred within the time frame alleged in the information. The State agreed with the motion, so the district court dismissed that count. The parties and the district court then discussed how to handle the fact that the jury had heard evidence on the dismissed count and whether the parties could address that evidence in closing arguments. The parties and the district court agreed the parties could address the evidence on that count in closing arguments and the district court would give a limiting instruction relating to the evidence.

The case proceeded to closing arguments, which is a major point of contention in this appeal and will be addressed in the analysis below. But in sum the State focused on the children's interviews and testimony and the DNA recovered from the carpet samples to prove that Everett was guilty. Everett's closing argument focused on impeaching the children's credibility, arguing the State did not prove each element beyond a reasonable doubt, and highlighting Everett's and Sandy's testimony that the children made up the allegations and that Everett and Sandy made the semen stains while having sex.

The jury found Everett guilty on the remaining counts. Before sentencing, Everett moved for a downward dispositional and durational departure sentence, which the district court denied. The district court imposed three hard 25 to life sentences for each

5

conviction of aggravated indecent liberties with a child, of which two were imposed consecutively, plus a consecutive 38-month prison term for the aggravated indecent solicitation of a child conviction. Everett timely appeals the district court's judgment.

CLAIMS OF PROSECUTORIAL ERROR

Everett raises numerous claims of prosecutorial error stemming from the State's opening statement and closing and rebuttal arguments. Everett claims the prosecutor's comments shifted the burden of proof, misstated the evidence, amounted to calling him a liar, and bolstered the credibility of the children's testimony. The State argues there was no prosecutorial error or any error was harmless.

The appellate court uses a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Mendez*, 319 Kan. 718, 737, 559 P.3d 792 (2024). When considering the error prong, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). If error is found, then this court reviews for harmless error under the standard in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 305 Kan. at 109. Under this standard, prosecutorial error is harmless only when the State can show "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109.

*The State did not impermissibly shift the burden of proof onto Everett.*

During the State's rebuttal closing argument while addressing Everett's defense that Hazel lied about her allegations, the prosecutor argued:

> "Finally, I just wanted you to think about this. Defense has given you an explanation about why [Hazel] might have lied, an explanation that, again, is undermined by [Everett]'s own testimony that he says he took back the military school thing.
> "Why would [Kevin] lie? Was there ever an explanation for that? Again, it's not his job necessarily to do that, but is there any explanation for that, other than what [Kevin] told you, these things actually happened? Why would [Kevin] lie?"

Everett focuses on this language to argue that the State impermissibly placed the burden of proof on him to show that Kevin lied. He cites *State v. Tosh*, 278 Kan. 83, 92, 91 P.3d 1204 (2004), in support. In *Tosh*, the State at closing argument in a rape case asked the jury, "'is there any evidence that it didn't happen? Is there any evidence that the things [the victim] told you didn't happen?'" 278 Kan. at 90. The Supreme Court found this statement improperly shifted the burden onto Tosh to prove his innocence. 278 Kan. at 92. But the facts here differ from those in *Tosh*. Most prominently, the prosecutor here acknowledged to the jury in the middle of its argument that "it's not [Everett's] job necessarily to do that" referring to the idea that it was not Everett's burden to come forward with evidence to prove that Kevin made up his allegations.

Everett's case tracks closely with *State v. McKinney*, 272 Kan. 331, 345-48, 33 P.3d 234 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2007). There, the State during closing argument argued that the defense's "'one job'" was to "'find out and give the jury a reason why [a witness is] lying. They cannot do it. If they could do it because they have to do it, otherwise you know [the witness is] telling the truth and you know that Les McKinney is a murderer.'" 272 Kan. at 346. The *McKinney* court considered the statements in context with the defense and found that the

7

State's argument was not prejudicial error where it was responding to a theory of defense already argued by defense counsel in closing argument. 272 Kan. at 347.

Everett, in his defense, argued a theory that Hazel had lied about her allegations in response to him being the family disciplinarian and threatening to send her to military school. In response to that argument, the prosecutor in rebuttal told the jury it was not Everett's burden to prove anything but pointed out that Everett had done little to impeach Kevin's credibility. As in *McKinney*, with the added context that the prosecutor was merely responding to Everett's theory of defense, we find no prosecutorial error.

*The State did not misstate evidence on the dismissed count.*

While addressing the evidence pertaining to the dismissed count, the prosecutor made the following comments during closing arguments:

> "I'll start at the end there, Goddard, Kansas was where this occurred. Now, you heard some testimony about a couple of different instances that [Hazel] described. One was—that first thing she remembered was when the defendant pulled her up on his lap and touched her under her clothes—or over her underwear but under her pants on her vagina. And I talked about this in opening with you. I was going to ask you to find the defendant guilty.
>
> "And she comes in, and she tells you, you know, actually, it happened in Great Bend. And that's important, because all these crimes have to have happened in Sedgwick County, Kansas. So you can certainly consider that first act that [Hazel] remembers and described to you and talked about in her interview as part of the pattern of abuse, and not just a pattern, but an escalating pattern of abuse started with that simple touching, then having her touch his penis, and then, ultimately, as we'll get to Count 2, trying to get her to have sex with him. You can certainly consider that.
>
> "But you know what? That first act happened in Great Bend. Okay."

Everett claims addressing the incident in Great Bend was error because the prosecutor did not "discuss the time frame problem and told the jury that the jury could certainly consider all of that evidence to support the State's argument that it helped establish a pattern of abuse." But Everett ignores that establishing a pattern of abuse logically shows that Everett's charged conduct was not a mistake and was done intentionally as part of a pattern to gratify Everett's sexual desires. Thus, the State's closing argument conformed with the limiting jury instruction.

Everett next argues that "with the detailed recitation of facts that were in no way supported by the evidence introduced at trial, the prosecutor intended to inflame the passions of the jury." The record does not support this claim. The State kept its recitation of facts brief and general. The prosecutor's comments were supported by evidence in the record. And nothing about the comments overemphasized or were emotionally charged to inflame the passions of the jury.

Everett also argues the State did not follow through on a "promise" to address the "time frame problem." The "time frame problem" refers to when and where the acts pertaining to the dismissed count occurred. Everett argued in support of his motion for judgment of acquittal that in Hazel's forensic interview, she stated the abuse associated with the count happened in Goddard, but in her testimony she said it happened in Great Bend. Everett also argued that the evidence showed Hazel lived in Goddard from third to sixth grade, which would have been "somewhere between 2016, 2020, and not during the time period of 2014, 2015, when this incident would have had to have occurred."

Everett's claim fails for more than one reason. First, at no point in the discussion on how to handle the dismissed Count I in closing argument did the State "promise" to address the "time frame problem." At most, the prosecutor said he would "address to the jury, like, you know, it's a little unclear exactly what the time frame of it was." But, more importantly, the State did address the "time frame problem" in the same context that

Everett argued it in his motion for judgment of acquittal. The prosecutor in closing conceded that the incident in the dismissed count occurred in Great Bend and not in Sedgwick County. Agreeing where the incident occurred amounted to agreeing when it occurred because the dates Hazel lived in Great Bend and Goddard were not disputed. We find no prosecutorial error on this point.

*The State did not misstate the evidence that Everett pushed Hazel onto the bed.*

In its opening statement, the State addressed its claim that Everett had solicited Hazel for sex after she had showered. Everett points to the following statement:

> "[Hazel is] going to tell you about another time after she turned 12 in 2020 that she got out of the shower, and she was walking to her bedroom in her towel, and the defendant's in her room watching what she says—or she described as sex videos on his phone. She sees this, and the defendant simply asks her if she wants to have sex with him, and he proceeds to push her down on the bed. And [Hazel] at this time sums up the courage to say no."

Everett claims that the phrase "he proceeds to push her down on the bed" misstates the evidence because the evidence was that he merely nudged her and did not push her down on the bed. In her forensic interview, Hazel disclosed that while on the bed with Everett he "just a little bit tried to push me down." At trial, Hazel characterized the push as "a little bit of a nudge."

Everett tries to make a semantic distinction that has no real consequence. In her testimony at trial and in her forensic interview Hazel disclosed that Everett "push[ed]" or "nudge[d]" her in an attempt to induce her to lie on the bed and have sex with him, and that she resisted the pressure to lie down. Thus, it was accurate for the prosecutor to say in opening that Everett "proceed[ed] to push her down on the bed." The evidence from

10

both the testimony and the interview shows that Everett had begun to exert some degree of push toward the bed which Hazel resisted. We find no prosecutorial error here.

*The State did not misstate why Hazel was crying during her testimony.*

During closing argument, the prosecutor asserted:

"And you can certainly consider [Hazel]'s demeanor on the stand. You got to watch her testify. You didn't just hear it. You didn't just read it on a page. You got to watch her. You got to see her cry as she talked about these things. You got to see the struggle that it was."

Everett argues that the State misstated the reason why Hazel cried during her testimony. From what can be gleaned from the record, the only point during her testimony where Hazel appears to have cried went as follows:

"[THE STATE:]  Did Fred [Everett], the defendant, ever talk to you about what might happen if you said something?
"[HAZEL:]  Yes. He told me that if I told anybody, then I would—we would both get in trouble, and we'd have to go away.
"[THE STATE:]  Did you want to go away?
"[HAZEL:]  No. I didn't want to leave, and I would not see my mom or my brother.
"[THE STATE:]  Did you consider [Everett] to be an authority figure?
"[Hazel:]  A what?
"[THE STATE:]  An authority figure, like, did he—he set rules, and he could punish you and things like that?
"[HAZEL:]  Yes.
        "THE [JUDGE]:  Mr. Steward, why don't you get some Kleenex up here."

Everett claims Hazel cried at this point because Hazel was being asked about her mother whereas he asserts the prosecutor argued she was crying about Everett's abuse. Everett's argument is not persuasive where it was only after the district court requested

11

Kleenex that the State started asking Hazel about her mother in detail. But more importantly, the prosecutor in closing argument very generally asserted that the jury could observe Hazel cry "as she talked about these things." With such a general statement as "these things," the prosecutor here appeared to be broadly referring to the case at large, which would include Everett's acts, the effect of reporting his acts, or perhaps Hazel missing her family. We find no prosecutorial error here.

*The prosecutor misstated why Hazel and Kevin wanted Everett to go to jail.*

During closing argument, the State asserted the following:

> "Why not take a bath when [the children] realized the consequences this would have for the defendant? This is a serious thing. But you heard [Kevin] say in the interview, they want him to go to jail, for their mom—
>
> . . . .
>
> "For their mom. This is heart-breaking for their mom."

During Kevin's forensic interview, he stated he thought Everett should go to jail for a long time but gave no indication that it should be because of Sandy. The State points out that the prosecutor also argued that the children wanted Everett in jail for themselves and to protect their younger sister but otherwise cites nothing in the record showing where the children stated they wanted Everett in jail for their mom, or for any particular reason, for that matter. Thus, technically the statement that the children wanted Everett in jail for their mom is error as it represents facts not in evidence.

But in any event, the error is harmless beyond a reasonable doubt. Common sense dictates that whether the children thought Everett should go to jail for their mother, themselves, to protect their sister, or any other reason has no relevance to the jury's assessment of guilt for any of Everett's convictions. It simply has nothing to do with the

12

outcome in this case. Considering the evidence against Everett, the length of the trial, and the inconsequential error, we find it harmless beyond a reasonable doubt.

*The State did not misstate evidence about DNA found on the carpet.*

As for the DNA found in the semen stains on the carpet, the prosecutor argued in closing:

> "Now, [Sandy] and the defendant tried to explain this away by saying that they'd had sex there about two years prior. Now, again, you get to use your common sense. I know you're probably not all DNA experts, and that's fine. You know how bodily fluids can sit, probably seen different fluids dry, probably cleaned up messes in your life.
> "Do you believe that a semen sample sat on that rug, that rug that Mr. Everett got mad, because the kids weren't keeping their room clean, things probably getting spilled, people are traipsing back and forth over it, sat there for two years, and the only major contributor that could be determined was Fred Everett's?
> "And also think about, why does Fred Everett want to have sex at the foot of a kid's bed?
> "So again, the DNA report, semen confirmed right there, 1 in 541 septillion chance, and again, also had a mixture profile. But again, containing the defendant's semen, 1 in 541 septillion chance that it was someone else."

Everett claims that "[t]here was no evidence during the trial about how other DNA would go into semen in a carpet over time. . . . So the prosecutor was impermissibly commenting derogatorily on Mr. Everett's and Sandy's testimony by arguing facts not in evidence." But Everett ignores that prosecutors may draw reasonable inferences from the evidence during closing arguments. *State v. Timley*, 311 Kan. 944, 950, 469 P.3d 54 (2020). That is all the prosecutor did here. The prosecutor drew a reasonable inference from the evidence that Everett, Sandy, and the children lived together in a family home, and that in those circumstances the carpets will be walked on and will get dirty through the daily course of life. The prosecutor then asked the jurors to use their own common

13

knowledge and experience to consider whether a stained carpet could remain untainted by other sources over the course of many years. Nothing about that portion of the prosecutor's statement misstates facts or relies on facts not in evidence.

Everett also points to the prosecutor's question about why he would want to have sex at the foot of a child's bed and argues it was a misstatement of evidence that inflamed the passions of the jury. But the prosecutor did not misstate any evidence where Sandy, for example, testified that she and Everett once had sex in the children's room "[r]ight in front of the [children's bunk] bed." That testimony was part of Everett's theory of defense to explain why the children's room had his semen stains on the carpet. So the State was merely highlighting the evidence and using it to invite the jury to question Everett's theory of defense. We find no prosecutorial error here.

*The prosecutor did not misstate evidence by saying the children both lived in Great Bend.*

The prosecutor during closing argument addressed Everett's theory that the children planned to accuse him of abuse as follows:

> "And then consider that the defendant's theory is that they planned this while he was supervising them. But he says it was the week after July 4th of 2020, that they are really being out of control. He threatens [Hazel] with military school. But then he also says, he kind of later told her, you know, it's not really happening. I was just angry sort of thing. Right? So he's taking back the threat and, apparently, the motive for all of this.
>
> "Then they go back to Great Bend where they both live. If they're going to plan this, they can plan it there. They don't say anything at that point. Hey, Fred touched me then. They apparently, in his theory, wait to come back until he is supervising them, sitting in there and having conversations, they say, okay, now, let's plan this while this guy we're about to set up is right out there. Does that make sense? And why not plan it when they were away in Great Bend?"

Everett claims the assertion that both children lived in Great Bend is a misstatement of the evidence. He is mistaken. Everett concedes Kevin lived in Great Bend at the time, but claims Hazel lived in Hoisington. But the State points out that Hazel testified that in "2020, no, I was living with my dad in Great Bend." Thus, saying both children lived in Great Bend in 2020 was not a misstatement of evidence.

Everett also claims the above statement amounted to the prosecutor impermissibly calling him a liar. We disagree. The prosecutor did not call Everett a liar. The State merely highlighted Everett's testimony and theory of defense, drew reasonable inferences from the evidence, and invited the jury to assess the evidence and draw its own conclusion. At no point in this portion of the argument did the prosecutor comment on Everett's credibility. We find no error here.

*The prosecutor did not make an impermissible golden rule argument.*

During closing argument while addressing the semen found on the carpet in the children's room, the prosecutor said:

> "Now, also consider that [Hazel] talks about the fact that the defendant would pull the chair around, and that molestation would happen right by the bed. Look up there in that top right corner. What's right there? That chair. Can you imagine that chair just being simply flipped around and ultimately a sample being deposited right where marker 7 is?"

Everett claims the prosecutor was impermissibly asking the jurors to place themselves in the position of the victim. "'A "golden rule" argument is the suggestion by counsel that jurors should place themselves in the position of a party, a victim, or the victim's family members.'" *State v. Lowery*, 308 Kan. 1183, 1208, 427 P.3d 865 (2018). This is impermissible because it asks the jurors to decide a case based on a personal bias or the jurors' own interest. 308 Kan. at 1208.

Everett cites *Lowery* in support of his claim. Awnterio Lowery killed Tiffany Davenport-Ray in a drive-by-shooting on the night of her wedding while she was in a car with her newlywed husband Melvin Ray and another passenger. 308 Kan. at 1185-87. During closing argument, the prosecutor invited the jury to imagine being in Ray's position during the shooting while he drove with his newlywed wife and was suddenly attacked by Lowery in a neighboring car. The Supreme Court found that this was a golden rule error because the prosecutor directly told the jury to imagine themselves in the victims' scenario. 308 Kan. at 1209.

Everett's case is distinguishable from *Lowery*. Here, the prosecutor did not ask the jurors to put themselves in the position of the victims or any other person. Instead, the prosecutor asked the jury to imagine *a chair* flipped around in the children's room which would then, according to the evidence, put Everett in a position to deposit one of the semen samples found in the carpet. And Hazel testified that Everett would turn the chair around and have her stroke his penis, so the evidence supported the statement. Thus, the prosecutor was merely addressing the evidence and drawing a reasonable inference therefrom to connect Everett's semen in the carpet to evidence of how Everett would place the chair while abusing the children. We find no error here.

*The prosecutor bolstered the credibility of a witness.*

During Everett's closing argument, his counsel impeached Kevin's credibility by pointing out that his testimony sometimes differed from his responses given during his forensic interview, and that he sometimes paused for long periods during his forensic interview. The prosecutor then responded in rebuttal:

> "Now, [defense counsel] kind of asked or intimates, you know, well, why is it that [Kevin] denies certain things in his interview and then talks about them today? Well, I asked [Kevin] about that too. And he told you that during, you know, in August of 2020, during the interview, it was confusing. It was confusing for a child of ten years old

16

to being touched by another man. Is it possible that [Kevin] felt shame, felt embarrassment, concern that he might be in trouble? Even if it's unreasonable to think, you know, when we're sitting here Monday morning quarterbacking, thinking, why on earth would he think he's in trouble? He's ten years old. And the man who yells at him, who punishes him, who's done these things, is it shocking, say, no, no, no, that didn't happen.

       "But you know what? He took that stand, took an oath to tell the truth, and he told you what happened."

Everett claims the last sentence impermissibly bolstered Kevin's credibility by stating that he told the truth in his testimony. Telling the jury that a witness is telling the truth is impermissible. See *State v. Hirsh*, 310 Kan. 321, 342-43, 446 P.3d 472 (2019). In *State v. McBride*, 307 Kan. 60, 65, 405 P.3d 1196 (2017), the prosecutor improperly bolstered witness credibility by saying, "'As she sat there under oath, on that stand and related to you in intimate detail that day, doesn't she deserve a certain presumption as well?'" The prosecutor's comment here is similar to the improper comment in *McBride*. The State had the right to respond to Everett's attack on Kevin's credibility. But the prosecutor crossed the line in the final sentence by saying that Kevin "took that stand, took an oath to tell the truth, and he told you what happened." This statement improperly bolstered the credibility of the State's witness and amounted to error.

But we find the error was harmless beyond a reasonable doubt. The statement was isolated and a small part of the prosecutor's lengthy closing argument. For the most part, Kevin's trial testimony was consistent with his statements in the forensic interview. And certainly all of Kevin's allegations against Everett were corroborated by Hazel's allegations. The State's K.S.A. 60-455 evidence on the jailhouse phone calls was highly incriminating. Finally, the DNA evidence was highly incriminating, despite Everett's attempts to explain how his semen was found on the carpet in the children's bedroom. We find there is no reasonable possibility the error contributed to the verdict.

17

*There is no prejudicial cumulative error.*

Everett also asserts cumulative error as it relates to the prosecutorial error.

"In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." *State v. Tully*, 293 Kan. 176, 205-06, 262 P.3d 314 (2011).

We have identified two instances of harmless prosecutorial error. The prosecutor misstated why Hazel and Kevin wanted Everett to go to jail. The prosecutor also bolstered Kevin's credibility with one isolated statement. Both errors were minor. We find the cumulative effect of these errors to be harmless beyond a reasonable doubt for the same reasons the errors were harmless individually. Considering the strength of the State's case against Everett including the K.S.A. 60-455 evidence and the DNA evidence, the length of the trial, and the inconsequential nature of the errors, we find no basis to overturn Everett's convictions based on cumulative prosecutorial error.

CLAIM OF SENTENCING ERROR

Everett claims the district court abused its discretion by denying his motion for a downward durational departure onto the sentencing grid because it only expressly denied the motion for dispositional departure and did not know it had discretion to grant a downward durational departure. The State asserts there is no error because the district court explicitly denied Everett's motion for downward durational departure.

Appellate courts review decisions on departure requests for an abuse of discretion. *State v. Powell*, 308 Kan. 895, 902, 425 P.3d 309 (2018). A judicial action constitutes an

18

abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025). Everett, as the party asserting an abuse of discretion, bears the burden to show it. *State v. Peters*, 319 Kan. 492, 497-98, 555 P.3d 1134 (2024).

At sentencing, Everett's counsel asked the district court whether it had received a copy of Everett's motion for a departure sentence, and the district court responded that it had received a copy. Everett's counsel then requested that the district court "consider a grid sentence in this case" because of Everett's criminal history score, the length of time that had passed since he committed prior crimes, his family responsibilities, and the fact he had performed well on Pretrial Services. After making those arguments, Everett's counsel repeated the request that the district court "consider imposing the grid sentence as opposed to the life sentence, which the Court has the ability to do that in a Jessica's Law case." Everett's counsel and Everett, speaking on his own behalf, then asked the district court to also consider a dispositional departure to probation.

After hearing the arguments and statements, the district judge ruled as follows:

"All right. Well, Mr. Everett, obviously I heard the same evidence the jury heard. Focusing on the jury, they were presented with the evidence. They certainly listened to it intently. They deliberated. They found beyond a reasonable doubt that you did commit these four crimes. I certainly can't dispute their findings based on the evidence. There was more than enough evidence to support their finding and their verdict. I don't expect that you agree with their verdict, but in the end the evidence does indicate that with regard to these two particular children that you did prey upon them, and they're certainly likely to be damaged for many years to come.

"So, to begin, I will tell you that probation is not an appropriate sentence in this case. So I'm not considering in any way that probation can somehow be imposed for any portion of the sentence. The law is clear as far as the three aggravated indecent liberties cases. These are Hard 25 cases, so 25 years before the possibility of release on any sort of

parole or postrelease supervision. I think that is an appropriate sentence, so I'm going to follow the presumptions in that regard."

Everett focuses on the district court's finding that "'probation is not an appropriate sentence in this case'" along with a lack of an explicitly stated denial of a downward durational departure to argue that the district court abused its discretion because it was unaware it had discretion to grant a durational departure.

Everett cites *State v. Ferenz*, No. 111,156, 2015 WL 967582, at *18 (Kan. App. 2015) (unpublished opinion), to support his claim. A jury convicted Ferenz of two counts of aggravated criminal sodomy and two counts of aggravated indecent liberties with a child. Ferenz moved for a downward durational departure and his counsel argued the motion at sentencing. The district court, without expressly denying the motion, sentenced Ferenz to the presumptive life sentences for each count. 2015 WL 967582, at *7. Ferenz argued on appeal that the district court abused its discretion by not expressly denying his motion for a downward durational departure. This court disagreed and as part of that ruling considered that there was "no indication that the sentencing court did not realize it had the authority to depart to on-grid sentences; it simply chose not to do so. A judge is not required to state the reasons a departure motion is denied." 2015 WL 967582, at *18.

Everett claims his facts are distinguishable from *Ferenz* because here the district court expressly addressed a dispositional departure by finding probation inappropriate. Therefore, Everett claims that shows the district court ruled only on the dispositional departure and thus did not know it had discretion to rule on the downward durational departure request as well.

The *Ferenz* case does not help Everett and actually cuts against his claim. To start, Everett's counsel reminded the district court that it had the ability to depart onto the sentencing grid in a Jessica's Law case. And immediately after finding that probation was

20

not appropriate, the district court then considered that presumptive sentences for Everett's convictions were hard 25 sentences. The district judge then found, "I think that is an appropriate sentence, so I'm going to follow the presumptions in that regard." This finding, and the district court's findings in totality, shows that the district court considered the jury's findings and the nature of the convictions and consciously decided to impose the presumptive sentences because they were appropriate to fit the crimes and their circumstances. It logically follows that to make such a conscious decision to "follow the presumptions," the district court had to have known that it had discretion not to follow the presumptions and impose some lesser durational sentence.

The district court's comments indicate the court was aware it could grant a durational departure but just did not think it was appropriate to do so. We find no abuse of discretion in how the district court addressed Everett's departure motion.

Affirmed.